EX PARTE CARLIN

CARLIN *v.* FISCHER, ET AL.

(Two Appeals in One Record)

[No. 127, October Term, 1956.]

528

*Decided March 15, 1957.*

The cause was argued before BRUNE, C. J., and COLLINS, HENDERSON, HAMMOND and PRESCOTT, JJ.

*Hilary W. Gans* for the appellant.

*Walter C. Mylander, Jr.,* and *Charles C. W. Atwater* for the appellees.

HAMMOND, J., delivered the opinion of the Court.

John J. Carlin became wealthy over the years operating amusement parks. His two sons, led by Richard M. Carlin, a member of the Baltimore Bar, and his two daughters, led by Elizabeth Carlin Fischer, who with her husband lived with her father, haggled over his wealth and the control of his affairs both before and after his death. Their efforts brought about the litigation we are asked to review in this appeal.

In late 1953 the Circuit Court No. 2 of Baltimore declared Mr. Carlin incompetent and appointed Richard and another lawyer, representing the daughters, as his trustees. Mr. Carlin died in May, 1954. The trustees advised the court that notice of *caveat* to his will had been filed by the sons and were authorized to continue the operation of the decedent's businesses.

In January, 1955, the two sons and the two daughters, each named as an equal residuary taker under the will, entered into an agreement for the division of his real and personal estate and for the purchase by the sons of shares of stock in one amusement park owned by the daughters individually. Thereupon, Mr. Carlin's will and a codicil were admitted to probate and the Circuit Court No. 2 of Baltimore assumed jurisdiction of the estate and of the consummation of the agreement for its division.

The various questions in the two equity proceedings were heard together by agreement. One appeal here is from a decree in the incompetency proceeding that required Richard to refund commissions he had taken for his services as co-trustee for operating the father's business for the period of seven months from the father's death to the assumption of jurisdiction of the administration of the estate by the equity court, as a result of the interpretation placed by the chancellor on provisions of Mr. Carlin's will that no child should receive any remuneration for in any way administering his estate.

A second appeal by Richard is from the chancellor's refusal in the proceedings for the administration of the estate to allow him fees for legal services claimed by him to be due by his father for the years 1937 to 1950, both inclusive. Both sons appealed from the direction of the chancellor in the proceedings for the administration of the estate that they must pay their sisters immediately the agreed amount of the purchase price for the stock. At the argument the parties agreed that this matter had become moot and, therefore, we give it no consideration.

We agree with the chancellor in his decision as to the right to commissions. Mr. Carlin's will gave the residue of his estate in equal shares to his four children, saying his intention was that the division among them should be "absolutely equal" and, to insure this, he provided that: "if any of my children who are named executors, *or serve in any capacity whatever* receive any remuneration *for administering my estate in any manner"*, then each of the other children shall receive the equal of that remuneration; it being his intention that "each

of my children shall receive no more and no less than any other of my children."

Elizabeth and Richard were two of the three executors named in the will. The codicil removed the third executor and named in his stead an employee of the testator, who was a legatee in the will. The codicil provided: "It is my desire and my understanding that my said executors hereinabove named shall waive all claim for commissions in the performance of their duties as my executors." Richard argues that he is entitled to commissions as trustee because the testator had in mind only commissions payable to executors for administering the estate in the Orphans' Court and that the language he used does not embrace trustees acting under the authority of an equity court. He argues further that the provisions of the codicil, the instrument last executed, control, and that a direction that executors shall receive no commissions is invalid under the authority of *American, etc., Comm. v. Eisenberg,* 194 Md. 193, and cases therein cited. As we read the will and codicil, the broad language used by the testator clearly embraced any pay received by any child for in any manner dealing with the settling of his affairs after his death. Cf. *Renshaw v. Williams,* 75 Md. 498. The will and the codicil are not inconsistent or contradictory and their provisions can be read together. The testator did not attempt to prohibit the allowance of commissions to a child. He provided merely that if a child receives any, the other children must be given an equal amount. We think that to permit Richard to retain his commissions, without an equal allowance to his brother and sisters, would defeat the clearly expressed intention of the testator.

The chancellor gave three reasons for refusing to allow Richard's claim for accumulated legal fees. He found (a) no evidence properly admissible that any such indebtedness was due and owing; (b) that the claim was barred by limitations; (c) that the matter was *res judicata,* because in 1954, in the incompetency proceedings, Richard had petitioned for and been allowed counsel fees for the years 1951, 1952 and 1953, without pressing or even referring to the claim for fees for the years prior to 1951. In this Court, the appellees make

no point of limitations by reason of our recent decision in *Talbert v. Reeves,* 211 Md. 275.

By stipulation of the parties, the claim of Richard for the sum of $13,363.91 for accumulated legal fees for the years 1937 to 1950, inclusive, was to be heard and determined as if it had been raised prior to the hearing by petition for payment and as if an answer thereto had been filed, raising all permissible defenses.

In order to understand the background of the claim, the chancellor admitted testimony of Richard concerning his agreement with his father as to the fees, although much of it was admitted subject to being stricken. The final ruling was that the records of the father were admitted and that testimony of Richard in clarification of any item shown by the records to be connected with the debt was admitted, and that any testimony beyond the books and the explanation of them, as well as that as to any transaction or conversation with the father, was stricken. The chief reliance of Richard was a ledger sheet of his father's with the heading "Richard M. Carlin", showing a balance of $14,044.22 as of the beginning of 1949, with a credit of $2,500 for that year. The sheet shows entries down to December 31, 1954, and a balance due as of January 1, 1955, of $13,363.91. Richard's testimony was that in 1937, when he was two years out of law school, his father had agreed to credit him with $2,500 a year for legal services, which he was not to receive but which he was to treat as having been received for the purpose of the federal income tax. He said that he paid the income tax on the $2,500 each year even though he had not received it. In 1942 he went into the Army, and, upon his return, entered the City Solicitor's office in Baltimore, and for these reasons there were no credits for the years 1943 to 1947. In 1946 the Internal Revenue Service questioned the legal fee for 1942 and Richard wrote the agent in charge that "The fee is subject to demand and has been ever since the time it was agreed upon. * * * You may rest assured that I regard it as part of my capital assets, and my father has indicated that it is available upon demand." This statement is at variance with Richard's testimony, that the agreement was that he would be credited with an annual re-

tainer of $2,500 and that his father would pay him "when he felt he could ·pay me or when I needed the money." We note that except for two $1,000 items, one of which was for Richard's honeymoon, all of the other payments in the later years were small. For example, in 1951, 1952 and 1953, the father paid $23.00 for the son's automobile license. Each year Richard's automobile insurance of $60 or $70 was paid. Payments usually would not exceed $100 in any year after 1948. For each of the six years from 1937 to 1942 and for 1948, 1949 and 1950 Richard, according to his testimony, was credited with $2,500, or a total of $22,500. During that period he was paid some $9,000—or a thousand dollars a year. It is hard to accept as a fact that a man with the wealth the record shows John J. Carlin to have had, could not, over those years, have been able to pay the balance of fifteen hundred dollars a year, if he owed it, or that Richard, whose income tax returns in evidence showed that often his total income, including the $2,500, was only $5,000 a year, could have failed to have needed the money during that period. The will of the father went to great pains to see that each child would receive no more and no less than each of the others. If he had felt he owed Richard some $13,000, or Elizabeth the substantial debt claimed by her, it seems likely that he would have referred to these debts in his will either by taking them into account for the purpose of equalization, or by reciting that they were not to be so considered, if that were his intention. Both from Richard's testimony and from what in fact took place, it would appear that Mr. Carlin was the absolute judge of his ability to pay and Richard's need. Such an indefinite obligation is scarcely distinguishable from that held not to have been binding and enforceable in *Meyers v. Josselyn*, 212 Md. 266.

If we assume, nevertheless, that the chancellor, despite his advantageous opportunity to appraise the witnesses, was wrong in his decision that the $13,363.91 was not due and owing, we think Richard still cannot prevail. His failure to make claim for this sum at the time he sued for and recovered the $2,500 a year for the years 1951, 1952 and 1953—when he could have just as well then sued for the fees claimed from 1937 to 1953—is a bar to his present suit. It is well estab-

lished that a single cause of action or an entire claim cannot be split up or divided and separate suits maintained for the various parts thereof. A judgment or decree in a suit for a part only of a single cause of action or entire claim permits *res judicata* to be successfully relied on if the remainder is sued on later. The rule is intended to prevent multiplicity of litigation and to avoid the vexation, costs and expenses incident to more than one suit on the same cause of action. Its bases are the maxims "that it is the interest of the State, there should be an end to litigation" and that "no man should be twice sued for the same cause." *Whitehurst v. Rogers,* 38 Md. 503, 513; 1 *C. J. S., Actions,* p. 1308; *Rosenstein v. Hynson,* 157 Md. 626. In *Olmstead v. Bach,* 78 Md. 132, one hired for a year was discharged. He sued before a magistrate for one week's salary. It was held that this precluded a subsequent suit since the first suit was necessarily for all the damages ever to be recovered for breach of the contract, although in form for salary. The Court said: "It was the appellant's plain duty to include all that belonged to that cause of action—that one breach—in the first suit, so that one proceeding and one recovery should settle the rights of the parties. It would be at his own risk and peril if he negligently or ignorantly omitted a part of what might properly have been embraced in the cause of action in the first suit." The Court went on to say: "He is not at liberty to split up his cause of action into fragments and successively sue for each when there has been but one breach of an entire and indivisible contract." See also *Hippodrome Co. v. Lewis,* 130 Md. 154, 158; and *Chapman v. Potomac Chemical Co.* (Ct. App. for the Dist. of Col.), 159 F. 2d 459.

The courts have had considerable difficulty in determining whether or not a contract is entire and indivisible and whether a breach is partial or total, but there is substantial unanimity that even if the contract is divisible, all that is due under it, or by reason of its breach, at the time suit is brought, must then be sued for, or the right to so much as is due but not sued for will be lost. In *Rosenstein v. Hynson,* 157 Md. 626, *supra,* the vendor filed an action of replevin to recover a player piano sold on a conditional contract of sale calling for in-

stallment payments. Previously he had sued the purchaser for but part of the purchase price, although at the time of the suit all of it was due. The Court said: "In suing for a part only of the installments in arrears, when he was entitled to sue for all, the plaintiff disregarded the sound and settled rule that a fully accrued cause of action for the breach of a single contract must not be subdivided for the purposes of separate suits against the same party. * * * The consequence of a violation of the rule is that a judgment recovered for part of the accrued indebtedness sued for separately may be pleaded to a suit for the residue of the claim, which is treated as being merged in the recovery procured in the first litigation." See also 3 *Corbin on Contracts,* Sec. 689, and Sec. 698; 5 *Williston on Contracts,* Rev. Ed., Sec. 1292; *Restatement, Judgments,* Sec. 62 generally, and comment h in particular; *Gibbs v. Didier,* 125 Md. 486; *Le John Mfg. Co. v. Webb* (Mun. Ct. App. Dist. of Col.), 91 A. 2d 332. Cf. *Ahl v. Ahl,* 60 Md. 207; *Gottlieb v. Fred W. Wolf Co.,* 75 Md. 126.

Richard M. Carlin argues that his claim through 1950, which he did not press in 1954, and his claim for the years 1951, 1952 and 1953, which he did recover, were different causes of action, that in the 1954 suit and in the suit now appealed from, the parties were different and that the 1954 hearing was not on the merits, so that the rule does not apply. He says that whereas what he was paid in 1954 was fees for legal services, the claim for the years before 1951 was a debt due him by his father because it was carried on a ledger sheet filed under the tab headed "Loans" and because a statement of his father's affairs caused by Richard to be prepared for use by a lawyer expert in estate planning and tax matters, showed the $13,363.91 as due from his father to him. We think the attempted distinction is without substance. Richard M. Carlin's whole claim is based on an agreement between him and his father, that he would be credited with the sum of $2,500 a year for legal services to be paid when he needed it, giving him the interpretation of the agreement most advantageous to him. If he made a loan of anything to his father, it was a loan of legal services and this is as true of the three

later years as of the first nine. Cf. *Buck v. Wilson* (Pa.), 6 A. 97.

The contention that the parties in the two actions are not the same, we find unconvincing. Richard's claim was against his father. At the time of the 1954 proceeding, his father was represented by the trustees, he being one. At the time the proceeding now under consideration was instituted, his father was, so to speak, represented by his executors, and Richard was one. The rule as to the identity of the parties is not absolutely rigid and inflexible; substance is looked to. *Sterling v. Local 438, etc.,* 207 Md. 132, 144. See also *Royston v. Horner,* 75 Md. 557, where the first suit was by the alleged lunatic and the second by his committee. There *res judicata* was held to apply.

We find the contention that the 1954 hearing was not on the merits not to be tenable. There was a hearing in open court and the contentions of the parties were received and considered. The order passed at that time was not a consent order, it was a judicial determination. True, the sisters made no formal objection to the court to the allowance of the claim but the picture painted by the record reveals why. Richard had fully discussed the payment of the monies claimed by him up to 1951 with his counsel and his sisters' counsel before he filed the claim for the services for 1951 through 1953. He had been told at conferences on the subject that the early claim was and would be disputed. The brothers were raising questions as to the validity of certain claims of Elizabeth, particularly the respective rights and obligations of Mr. Carlin and Elizabeth under an oral lease to her of the roller rink business, under which she was to use certain sums payable to her as rental for the maintenance of her father's residence. The same decree that allowed Richard's claim for $7,500 settled various contentions as to Elizabeth's rights and debts. Richard seems to have been content to have taken the $7,500 that he could get then, provided he did not press the claim for the earlier years, hoping, perhaps, that after his father died and major points of differences between him and his sisters had been settled, he could press the earlier claim, as he has done. The portion of the order that covers the fees of $7,500

is preceded by this recital: "Testimony having been taken and all parties having been heard, it is further ordered" and so forth. We think the court's order was on the merits. *Pugh v. Waclawski,* 211 Md. 346.

In *Trayhern v. Colburn,* 66 Md. 277, the Court decided that the doctrine of *res judicata* applied despite the fact that the first proceeding was decided on bill or petition, and answer, without the taking of testimony. See also *Bruner v. Ramsburg,* 43 Md. 325; *Cone v. E. Balt. Land & Build. Soc.,* 40 Md. 380. In *Potter v. Harvey* (R. I.), 82 A. 812, a doctor filed a claim in a decedent's estate for board for a stated period and for professional services for a stated period. The claim was allowed. Later, he sent another claim for professional services for another stated period. Necessarily all professional services had been rendered at the time of the filing of the first claim and the court held that the claim could not be split, and the fact that the recovery was had on the first claim would be regarded as acceptance of that part for the whole of the claim.

We think the chancellor was correct in deciding that Richard M. Carlin was not entitled to recover the sum he claimed to be due him for professional services from 1937 to 1950.

*Decrees affirmed, with costs.*