684 A.2d 904

Kanaiyalal J. PATEL

v.

HEALTHPLUS, INC., et al.

No. 239, Sept. Term, 1996.

Court of Special Appeals of Maryland.

Nov. 8, 1996.

252

William J. Skinner, Rockville, for Appellant.

Jeffrey A. Lamken (Mark C. Hansen, Kellogg, Huber, Hansen, Todd & Evans, Washington, D.C., Linda C. Carter and Meyers, Billingsly, Rodbell & Rosenbaum, Riverdale, on the brief), for Appellees.

Argued before CATHELL, DAVIS and HARRELL, JJ.

CATHELL, Judge.

In this case, a physician had a contractual relationship with a Health Maintenance Organization HMO that required him to perform services for the HMO's members. In return, he was to receive certain fees from the HMO that were to be paid

pursuant to the terms of the contract. Disputes arose as to whether he was being, or had been, paid the correct sums in the manner contractually required. He initiated suit in the District Court against the HMO for sums due for services rendered to one of the HMO's subscribers. He won. He then sued the HMO again in the District Court for sums due for services rendered to another one of the HMO's subscribers. While that was pending, he initiated another suit in the District Court against the HMO for sums due for services rendered yet another of the HMO's subscribers. All of the subsequent actions or potential actions could have been filed at the time of the initial action. The HMO instituted a declaratory judgment action in the circuit court asking that court to declare that the fees claimed in the subsequent two cases, as well as numerous other cases, were uncollectible because the doctrine of *res judicata* applied. The circuit court agreed and declared that the maintenance of the subsequent suits was barred.

Kanaiyalal J. Patel, M.D., is the appellant who appeals from the granting of motions for summary judgment and for dismissal in favor of HealthPlus, Inc. (HealthPlus), appellee, a health maintenance organization (HMO), and Sandra Sheppard (Sheppard), a HealthPlus employee.[1] In the first of the actions mentioned above, appellant recovered fees owed to him by appellee for services he rendered pursuant to the same contract at issue in the subsequent two cases and in the declaratory judgment action. Appellant presents three questions:

I. Did the Circuit Court know and understand the material provisions of the "contract" allegedly before it and did the Circuit Court know if this was the same "contract" before the District Court in Civil No. 5–23594–94 (the V.S. case)?

---

1. Ms. Sheppard is also an appellee. When we resolve the issue in respect to her, it will be apparent. Otherwise, our use of the word appellee refers to HealthPlus.

II.   Does the Doctrine of *Res Judicata* apply to preclude the 270 alleged claims against HealthPlus and two additional cases filed by Dr. Patel?

III.   Does the Doctrine of *Res Judicata* preclude Dr. Patel's counterclaims in Civil No. CAL 95–02017 and was the dismissal thereof and the two additional cases proper?

Questions two and three are actually the same question, *i.e.,* did the trial court properly apply the principles of *res judicata* in the granting of the motions?   Accordingly, we shall later address them simultaneously.

Question one alleges no error.   It merely asks this Court if the trial court understood the terms of an agreement.   In respect to this question, appellant states in his argument:

Before the transaction test can be applied, the transactions or lack thereof must be understood by the trial court on a Motion for Summary Judgment. . . .

. . . .

In order for the Circuit Court to determine that the "contract[s]" that Judge Kelly ruled on [were] the identical contract[s] . . . before it . . . would require the Circuit Court to demonstrate that it knew this intention to be the case. . . .

. . . .

Nor is it possible . . . to see that the Circuit Court understood what "contract[s]" it determined had been ruled on in the District Court. . . .   The Court of Special Appeals must now determine if the Circuit Court was legally correct. . . .

Neither the District Court decision . . . [allegedly creating *res judicata* ] [n]or the sworn evidence before the Circuit Court . . . can be relied upon to determine the intention of the parties under the "contract". . . .

. . . [T]he intention of the Circuit Court . . . is not disclosed any further than it was based solely on *Alvey v. Alvey, supra,* and *Rosenstein v. Hynson [*157 Md. 626, 147 A. 529 (1029)] *supra.*   That is all that Appellant can . . .

interpret from a fair reading of the decision. Appellant believes the Circuit Court decision[s] ... are legally wrong.

All we can interpret from a reading of appellant's first question and the argument in support of it is that appellant's position is that the circuit court has to be wrong because appellant does not understand what happened. Maryland Rules 8–504(a)(3) and (4) require that questions presented state "the legal propositions involved," and the brief must contain a "clear concise statement of the facts material to a determination of the questions presented." Appellant's first question appears merely to state a disagreement with the result rather than to assign reversible error. Thus, we shall not directly address it because we cannot perceive what it is we are asked to address. It appears, however, that we may answer question one, whatever it may be, as we address questions two and three. We note that the trial courts' decisions [2] were based completely on their application of *res judicata* principles.

The second and third questions presented by appellant are:

Does the Doctrine of *Res Judicata* apply to preclude the 270 alleged claims against HealthPlus and two additional cases filed by Dr. Patel?

Does the Doctrine of *Res Judicata* preclude Dr. Patel's counterclaims in Civil No. CAL 95–02017 and was the dismissal thereof and the two additional cases proper?

In order to respond adequately to these questions (really one question), we first note that certain of appellant's arguments will require us to examine the contractual nature of the tripartite relationship that generally exists when some types of health maintenance organizations are involved. In stating appellant's arguments and in later addressing the *res judicata* issue, we are concerned primarily with the nature of the contract between appellant, a physician, and the HMO, not in whether fee computations were accurately made or procedures adequately followed or even understood. If there is one

---

2. There were two decisions by two trial judges.

general contract between appellant and appellee as to fees, certain *res judicata* principles may apply. If the arrangement is a series of contracts between appellant and appellant's patients, other principles may apply.

With respect to the relationship among appellant, Health-Plus, and Sheppard, appellant argues

that HealthPlus is an HMO that "arranges health benefits" for its members by contracting with private practicing physicians. Dr. Patel does not disagree that HealthPlus arranged for him to provide services to HealthPlus patients, but he asserts strongly that he still makes his own professional determination about each person referred being his patient in return for accepting what HealthPlus would pay for that service.

Dr. Patel states that each patient is referred by a primary physician, not by himself. *Thus, there is no series of transactions with the HealthPlus* patients. Each patient is referred to Dr. Patel for different reasons and each is treated according to his or her needs. *This is not a mere series of transactions between HealthPlus and Dr. Patel.*

. . . .

... There never was an expectation that the physician provider had to sue HealthPlus over every breach of contract at one time if a claim could not be resolved.

This Court can well understand the reluctance of some physician providers to take action against HealthPlus or any other HMO or insurance company when they are receiving a large percentage of their patients on referral from such an organization. [Emphasis added.]

As is apparent, appellant contends that each visit with a patient who was a member of the HMO was a separate "transaction," *i.e.*, a separate contractual arrangement.

In order, therefore, to address appellant's arguments and answer the questions presented, we must establish what a

health maintenance organization, in a general sense, is.[3]   We
must also examine the contract between the parties in the
context of HMO/physicians, HMO/subscribers, and physi-
cian/patient relationships.

.   █   HMO is a generic term for prepaid health coverage
plans that provide medical services to a relatively large popu-
lation at a fixed rate.   There are five salient characteristics of
HMOs.

1) HMOs assume the contractual responsibilities for pro-
viding health care services to subscribers (subscribers and
members are used interchangeably).

2) HMOs are closed health care systems, providing ser-
vices only to a defined and enrolled clientele.

3) Members are voluntarily enrolled.

4) Payment [by the members] for care is fixed and peri-
odic.

5) HMOs assume financial risk, which may level either to
a loss or a gain.

Health Maintenance Organization, *Analysis of the HMO In-
dustry in Maryland,* Research Division, Department of Legis-
lative Reference, Legislative Report Service, November 1986.

There are several models of HMOs in respect to the manner
of providing health services to members.   They include gener-
ally:  (1) Staff Models—the HMO employs salaried health care
professionals to provide health care services;  (2) Group Prac-
tice Model—the HMO contracts with a private practice group
to provide health services to members;  (3) Independent Prac-
tice Association—physicians create the HMO as an association
of physicians or individual physicians to provide health care to
members usually on a fee for service basis (the fees are fixed
and the individual physician bears the risk of loss if the cost of
the service exceeds the fee schedule) but sometimes on a

---

**3.**   The first HMO may have been the Boston Dispensary, as it operated
before World War I.   *See* Barbara A. Shickich, *Legal Characteristics of
the Health Maintenance Organization,* in Healthcare Facilities Law
§ 16.1 (Anne M. Dellinger ed., 1991).

capitation basis (a fee of X amount per applicable member of the HMO); and (4) Network Model—the HMO contracts with one or more physicians or group practices.[4]

Shickich defines an HMO as " 'an organization which brings together a comprehensive range of medical services in a single organization.' " Barbara A. Shickich, *Legal Characteristics of the Health Maintenance Organization*, in Healthcare Facilities Law § 16.4 (Anne M. Dellinger ed., 1991) (footnote and citation omitted). She describes three characteristics of an HMO:

(1) It is an organized system for the delivery of health care which brings together health care providers.

(2) Such an arrangement makes available basic health care which the enrolled group [the members or subscribers] might reasonably require. . . .

(3) The payments [to the HMO] will be made on a prepayment basis, whether by the individual enrollee[ ] . . . [or in his behalf by others, *i.e.*, employers].

*Id.* (footnote omitted).

As Shickich notes, an HMO is a vertical system of health care that brings together the providers, *i.e.*, the physicians, dentists, etc., who provide medical services, and the subscribers, *i.e.*, the members of the HMO or HMOs, who receive the medical services. An HMO is a facilitator. It arranges for medical services. In doing so, it enters into two or more basic contractual relationships. First, it agrees (contracts) to provide medical services, either through its employee physicians or through providers under other contracts, to its subscribers

---

**4.** There may well be many other combinations and variations. Those described appear to be those most often created. *See* Alan Somers, *What You and Your Physician Client Need to Know About Managed Care Contracts*, PRAC. LAW., Mar 1996, at 22. Additionally, Point of Service HMOs (POS) sometimes contract with other HMOs for those HMOs to provide a part of the services the POS HMOs are contractually required to furnish their members. It can be contemplated that a large number of possible combinations might be created in the future—if not already in existence. Most, if not all, of these new HMO creations should, however, retain the general characteristics mentioned above.

for a fixed fee which is paid by the subscribers to the HMO. The HMO then (if it is not a "staff model," as appellee is not) enters into a separate contract or contracts with physicians (or dentists, etc.) for the physicians to provide the medical services the HMO has agreed to provide to its members under their separate subscriber contracts. Apparently, it is through its bulk buying power, *i.e.*, its power to direct its members, that it is able to procure medical services at or below otherwise prevailing rates. Additionally, it is presumed, by at least "for-profit" HMOs, that large numbers of subscribers will not need medical services or that the medical services provided to subscribers will cost less than the membership fees received.

It is through this relationship that "for profit" HMOs hope to achieve success. Because many members will utilize services at a cost of less than the fee the subscriber pays to the HMO and a significant number will utilize no services at all, and because the HMO is able to obtain medical services at lower rates due to its ability to direct volume and control costs through its ability to impose treatment limitations and lower fees on providers, *i.e.*, physicians, the HMO hopes that it can produce a profit after the cost of administering the program. Thus, there may be constant pressure to keep some costs, *i.e.*, the fees it pays providers, down and pressure to keep subscriber fees at the maximum level that will not result in a loss of subscribers. Its arrangements with providers, therefore, might be characterized as inherently contentious, and even litigious, because of the ebb and flow of cost-cutting pressures inherent in the business arrangement and the conflict between a physician's judgment in respect to treatment and an HMO's efforts to control treatment options. The cutting of costs and the increase in fees go in different directions under different contracts. The member who pays the increased fees has no reason to object to the HMO's cost-cutting, and the provider has no reason to object to the HMO's increasing of fees. While, at a glance, it appears to be a triangular relationship with the HMO at the apex, it is really two-sided—right

(member) and left (provider) both meet at the apex (HMO) but with no contractual base line between the subscriber and the provider.[5]

It is clear that there are two distinct and separate types of contractual agreements necessary or extant in this relationship—the HMO–Subscriber Contract and the HMO–Provider Contract.

The HMO–Subscriber contract can also involve parties other than subscribers. Often, employers, both private and public, agree to bear a portion of a subscriber's (its employees') fees, and the HMO agrees to offer memberships to all of the employees of that particular employer. Different employers may negotiate different subscriber contracts with the HMO. Consequently, it may be possible for HMOs to have numerous different subscriber contracts with their members who work for different participating employers. In this way, and in other ways as well, there may be different classes of subscribers.

On the "provider" side of the relationship, an HMO may contract for doctors, specialists, primary care physicians, referrer and referee physicians, etc. The number and variety of these contracts depends only upon the various types of services desired to be provided the HMO's subscribers. The more and varied the services necessary to enable the HMO to achieve its desired membership size, the more and varied the nature of its staff physicians (in a Staff model) or the more and varied the nature of the various providers with whom the HMO contracts. It generates revenue by increased membership. It reduces service costs by suggesting treatment options and by negotiating with providers to furnish services at the lowest possible cost. If revenues exceed costs, the HMO, as is generally the case in many businesses, has a profit—

---

**5.** Contractual copay provisions of the member's contract would flow around the apex to the physician. While copays may go directly to the provider, the contractual basis results from a member's contract.

otherwise it has a loss.[6]

Both the HMO and the physician are providing medical services. The medical services are provided to the subscribers. The members contract with the HMO. The doctor contracts with the HMO. In membership contracts without copay provisions, the members are never obligated to pay the doctor for any portion of his services. The issues in the case at bar do not involve copayments. The contracts between the HMO and the doctor, as in the case at bar, require the doctor to accept the fees agreed upon between him/her and the HMO as full payment, subject, of course, to any adjustment provisions contained in the contract.

Due to the importance of the product, *i.e.*, health care services, that both the HMOs and the providers are offering, both federal and state governmental regulation has evolved. In the case *sub judice*, we will be basically concerned with State regulations.

The term "benefit package" is statutorily defined as

a set of health care services to be provided to a member of a health maintenance organization under a contract [the HMO–Subscriber contract] that entitles the member to the health care services, whether the services are provided:

(1) Directly by a health maintenance organization [Staff model]; or

(2) Through a contract or arrangement with another person [the HMO's contract(s) with outside providers].

---

6. Many provider contracts contain provisions adjusting the sums a provider receives either up or down during a stated period based upon the amount of revenue to the HMO above or below costs. These adjustments are made at the end of a fixed period and are paid in addition to, or recovered in spite of, the sums periodically paid to the provider during the period. There appears to have been such an arrangement, or one similar to it, in the case *sub judice*. Due to the limited nature of the relevant aspects of this appeal, it is not necessary for us to consider such adjustments.

Md.Code (1982, 1996 Repl.Vol.), § 19–701(b) of the Health–General Article.[7]   In the case at bar, we are concerned only with subsection (2) above.

Section 19–701(f)(5) provides that non-staff model HMOs that contract with physicians for services for their members do so, as relevant to the case *sub judice,*

(ii) Under arrangements with ... physicians ... on ... individual practice basis, under which [the physician]:

1.   Is compensated for its [his/her] services primarily on the basis of an aggregate fixed sum or on a per capita basis; and

2.   Is provided with an effective incentive to avoid unnecessary inpatient use, whether the individual physician members of the group are paid on a fee-for-service or other basis.

Section 19–712(a)(3) provides, in part, that an HMO may utilize either its employees to provide health care services to members or may utilize "licensed providers ... who are under contract with ... the health maintenance organization."   It is clear that appellant was a provider pursuant to a contract with appellee.

Nevertheless, he argues that "the custom and trade in the business and the expectations of the parties was that each claim for each patient was a separate and distinct [contract] that would be resolved separately."   He notes that in this case, "there was no single transaction or series of related or connected transactions."   Appellant seemingly argues that there was not one contract between himself and appellee but that each patient he saw constituted a separate contract with that patient who he could sue in addition to being able to sue appellee for payment under the primary contract.   We shall later note statutory prohibitions to such arrangements.

■   The parties do not direct our attention to any Maryland case that construes the nature of contracts between

---

7.  All subsequent statutory citations are to the Health–General Article unless otherwise noted.

HMOs and providers in the context of a fee dispute. We have found none. Moreover, neither party refers us to any foreign cases on the subject. Likewise, we have found none. The few cases that involve HMOs relate to malpractice liability, negligence, and other matters. The cases include *Sanus/New York Life Health Plan, Inc. v. Dube–Seybold–Sutherland Management, Inc.*, 837 S.W.2d 191 (Tex.Ct.App.1992), involving capitation fees.[8] In it, the Court held that when the means of determining the amount of fees due are under the control of the HMO, a requirement of fair dealing applies. The Court resolved the issue under traditional contract interpretations. Whether a fair dealing requirement applies is not relevant here due to the posture of the case on appeal.[9] This case revolves around the application of *res judicata* principles.

---

**8.** "Capitation fees" are per member fees as opposed to fees for services actually performed. In other words, the provider receives a monthly fee based not on the services it actually performed but on the basis of the total number of members of the HMO eligible for the provider's services regardless of whether such services were used. "Capitation" is generally an amount budgeted per person. It then transmogrifies in some fashion to a fee to a provider based upon the number of subscribers. The "average care cost for one HMO member for one month" is "also called cost PMPM, 'cost per capita per month,' or 'monthly capitation.' Doctor[s] ... will ... benefit from understanding these concepts ... as proposals involving capitation come with budgets [that can be] formatted differently." *Somers, supra* at 31. We note, however, that the definition and "understanding" of capitation might well also depend upon what the HMOs and providers agree as to its meaning in the terms of any respective contract. Capitation definition issues appear to be fertile subjects for litigation. It may be that capitation issues should be addressed by the Legislature in order to establish some uniformity of meaning and understanding of the term.

Conversely "Fee for Service" has been defined as "an arrangement under which a buyer [an HMO] and a provider [physician] of health care agree that the [HMO] will pay the [physician] a specific amount for each specific procedure performed." *Somers, supra* at 21. The capitation fee in *Sanus, infra,* was calculated on several bases; what basis was dependent upon the size of the various member's families, *i.e.,* single member, family, etc.

**9.** Dr. Patel appears to have been a contract specialist. HMOs often, and this one appears to have done so, set up primary physician/specialist arrangements. The primary care contract provider refers the member to a specialist. Usually, the primary care provider is responsible for determining a member's eligibility status. Depending on the ar-

The Supreme Court of New Hampshire, when reviewing the termination of a provider's contract, rejected a trial court's characterization of the arrangement between an HMO and a provider as an employer-employee relationship in *Harper v. Healthsource New Hampshire,* 140 N.H. 770, 674 A.2d 962 (1996). Appellant, in the case at bar, was terminated by appellee because he was convicted of a federal felony and because he lost his license to practice in Maryland. Although appellee asserted in its brief that appellant is motivated by his desire, now that his license has been restored, to be reinstated as a provider by the appellee, appellant does not, in this case, challenge his prior termination or appellee's refusal to reinstate him. Thus, *Harper* is directly pertinent not for its discussion of public policy [10] issues but for its comments on the nature of the relationship. We acknowledge the comprehensive statutory enactments in Maryland evidencing the Legislature's extensive public policy concerns. Due to the posture of this case, public policy concerns are not determinative, and we hereafter address such concerns only peripherally. *See also Raglin v. HMO Illinois,* 230 Ill.App.3d 642, 172 Ill.Dec. 90, 595 N.E.2d 153 (1992) (characterizing providers as independent contractors); *Olaf v. Christie Clinic Ass'n & Personal Care HMO,* 200 Ill.App.3d 191, 146 Ill.Dec. 647, 558 N.E.2d 610 (1990) (concerning the relationship between the provider and the HMO's members in a physician-patient context);

---

rangement of a particular HMO and its arrangements with its primary care contract provider/physician, the primary care provider then refers a subscriber to a specialist. *If his arrangement with the HMO provides for it,* the referral can be to a specialist that has no separate contract with the HMO, or it can be a specialist who is also under contract with the HMO, such as Dr. Patel in the case at bar. Specialists with contracts with the HMO are sometimes termed "affiliated providers;" those specialists without contracts are sometimes referred to as "unaffiliated providers." However, in some HMO arrangements, the terms "affiliated" or "non-affiliated" have entirely different meanings depending upon how the parties, in their agreement, define the terms.

**10.** The case *sub judice* does not relate to professional patient services aspects in which public policy issues might be paramount. Instead, it relates to the business aspect of the collection of sums due, not from the patients, but from the HMO.

*Freedman v. Kaiser Found. Health Plan,* 849 P.2d 811 (Colo. Ct.App.1992) (holding that HMOs are not insurers against a provider's negligence although leaving open the possibility that an HMO might be subject to actions in negligence if it selected unqualified providers).

Our review of the treatises, the cases, and the statutes, leads us to hold that, unless a contract provides to the contrary, a provider's (physician's) contract with an HMO governs his recovery of fees for services rendered to an HMO's subscribers. Except to the extent a contract lawfully permits him to collect fees from an HMO subscriber he may not do so. Copayments (or, as in the case of insurance, percentages or deductibles) may, under certain circumstances, as we shall discuss, be collectable from a patient. In the case *sub judice,* however, the contract at issue and the fees sought from the HMO are not based on copay provisions. If they exist in this case, and the agreement indicates that they might, such copay provisions would not affect a resolution of the *res judicata* "transaction" issue. Except as to copays contractually provided for, the applicable statutes prohibit a provider from attempting to collect fees from an HMO's subscriber. The fees appellant was attempting to collect in the prior and present cases were not copayments. Accordingly, appellant's only right to collect these fees for the services rendered in respect to his various and numerous bills was under his master contract with appellee—the HMO–Provider contract at issue. Appellant had no contractual right to collect any of the sums being sued for from the HMO's subscribers.

In the initial suit in the District Court, Civil No. 050–23594, for recovery of fees for services rendered to Vivian Stevens, appellant made several contentions. He noted that 1) appellee was a successor corporation to the "non-profit Prince George's Health Services Foundation, Inc."; 2) he had an agreement with appellant to provide specialist physician services; and 3) he would be paid, as appellant quotes, " 'usual and customary compensation' for the same service among other physicians participating.' "[11] This quote (with one difference—a trans-

---

11. "Fee for services" basis.

posing of "physicians" and "participating") appears to be taken from Attachment B—"Physicians Compensation"—of an agreement entitled "Prince George's Health Services Foundation, Inc., Specialist Physician Agreement." Appellant, in his breach of contract claim, stated that he and appellee "have a written agreement which provides that K.J. Patel will be paid for services provided to patients referred to K.J. Patel by HealthPlus" (the successor to the previous HMO). In that District Court suit, appellant was relying, therefore, on the "Prince George's Health Services Foundation, Inc., Specialist Physician Agreement" an unsigned copy of which is in the record.

■ In the next District Court suit, Civil No. 050–27712, involving services rendered to patient McCoy, appellant clarified that he was operating under the previous contract. Appellant stated: "In 1983, K.J. Patel entered into an agreement to provide specialist physician services for patients of Prince George's Health Services Foundation, Inc., . . . which was later transformed into a for profit corporation, and purchased . . . and operated as HealthPlus, Inc." [12]

Consequently, it is clear that the contract forming the basis of the arrangement between appellant and appellee is the one found in the record. As the circuit court trial judges rendered judgments on *res judicata* grounds in the case *sub judice,* any further relevance of any subsequent modifications, interpretation of the procedure for payment of bills, the fairness or correctness of fees, the intentions of the parties as to method of payment, whether the trial judge in this case knew of their intentions, etc., will, in the context of this case, be relevant only *if* we were to reverse. If *res judicata* does not apply, the case will need to be remanded, at which time these ancillary issues could presumably be addressed.

---

12. To the extent it may be or is now argued that the original contract did not survive the conversion from a nonprofit HMO to a for-profit HMO, we look to Health–General Article § 19–711.1(e), which states: "All outstanding contracts of the converting health maintenance organization shall remain in full force and effect."

We look now to the agreement to see whether it limits the ability of appellant to maintain separate suits against the patients for the fees. Appellant argues that it does not; he asserts that this case is distinguishable from the application of transactional analysis in the *res judicata* context.

As directly relevant, and in association with the statute we will discuss, the following provisions of the contract are important:

WHEREAS, IPA [13] desires to enter into an Agreement with Specialist Physician obligating him to perform said specialist health services for the Members of Health Plan;

WHEREAS, IPA as well as Specialist Physician desires to enter into an Agreement which recognizes fully the contributions of Specialist Physician and assures continuous harmonious management of the affairs of IPA; and

WHEREAS, IPA and Specialist Physician mutually desire to preserve and enhance patient dignity;

... [I]t is initially covenanted and agreed by and between the parties hereto as follows:

. . . .

## II. Compensation

Specialist Physician's compensation for services hereunder shall be at the rates set forth in the Fee Schedule for Specialist Physicians annexed hereto as Attachment B. IPA and Specialist Physician agree that the objective of the fee arrangement described in Attachment B is to provide equitable distribution according to level of activity, appropriateness of service volume as determine[d] by peer review and distribution of surpluses based on reductions in utilization. The availability of such distributions will be used to encourage appropriate high-quality utilization patterns and

---

13. The predecessor HMO, Prince George's Health Services Foundation, Inc., was an HMO formed by an independent physician's association (IPA). In its agreement, the name of the HMO was shortened to "hereinafter called 'IPA.' " It is unclear whether that prior HMO was a staff model. In any event, HealthPlus is not.

strengthen services.[14]  *Specialist Physician shall look only to IPA for compensation and at no time shall he seek compensation from* Health Plan Members for services except for the nominal co-payments permitted under the Member's Medical and Hospital Service Agreement with Health Plan, a copy of which is attached hereto as Attachment C and made a part hereof.

. . . .

C.   This Agreement shall be governed in all respects by the laws of Maryland and 42 U.S.C. § 300e, *et seq.*   The invalidity or unenforceability of any terms or conditions hereof shall in no way affect the validity or enforceability of any other term or provision.

. . . .

## ATTACHMENT B

## PHYSICIAN'S COMPENSATION

Physician compensation for health services shall be determined by IPA, the maximum amount payable for any one service being established by IPA based on historical records of the usual and customary compensation for the same service among other participating physicians in IPA.   [Emphasis added.]

The contract upon which appellant relies prohibits any attempt on his part to initiate separate suits against individual patients for collection of fees for services he rendered to the appellee's subscribers except as to any applicable copay provisions.   Even if copay provisions were contained in the applicable contract, no copay *issues* are, as we have indicated, present in this particular appeal.

---

**14.**   The contract, although on a "fee for services" basis, contained adjustment provisions designed to encourage efficiency in that, under the contract, "surpluses" if any could be distributed apparently to the provider.   As this matter is before us in a *res judicata* basis, we need not, in this appeal, fully explain the nature of such adjustments.

**270**

Based upon this contract, appellant filed the initial District Court suit that we have mentioned; that court determined that contract to be valid and rendered judgment for appellant, a judgment that appellant accepted and did not appeal.[15]

In addition to the contract provisions, and more important, a statute prohibits appellant from instituting or maintaining separate contractual actions, for the fees that are the subject of the underlying suit at issue here, against members of the HMO for services rendered to them pursuant to appellant's contract with appellee.

Section 19–710 requires that all agreements between HMOs and providers contain a hold harmless clause. This section provides:

(h) *Hold harmless clause.*—(1) ... Agreements between a[n HMO] and providers ... shall contain a "hold harmless" clause.

(2) The hold harmless clause shall provide that the provider may not, under any circumstances, including nonpayment of moneys due the providers ... or breach of the provider contract, bill, charge, collect a deposit, seek compensation, remuneration, or reimbursement from, *or have.*

---

**15.** One who voluntarily accepts the benefits of an adjudication or decree may not question its validity on appeal. *Suburban Dev. Corp. v. Perryman*, 281 Md. 168, 377 A.2d 1164 (1977).

In *Suburban*, the Court of Appeals, dismissing an appeal *sua sponte*, stated that:

It is well settled in Maryland, and the law generally is to the effect, that if a party, knowing the facts, voluntarily accepts the benefits accruing to him under a judgment, order or decree, such acceptance operates as a waiver of any errors in the judgment, order or decree and estops that party from maintaining an appeal therefrom.

*Id.* at 171–72, 377 A.2d 1164 (quoting *Dubin v. Mobile Land Corp.*, 250 Md. 349, 353, 243 A.2d 585 (1968)). "Put another way, as to related claims adjudicated in the same action, one cannot 'have his cake and eat it too' by accepting the rewards of those portions of the decree he finds palatable while reserving the right to contest the balance." *Kicherer v. Kicherer*, 285 Md. 114, 117, 400 A.2d 1097 (1979). *See also Silverberg v. Silverberg*, 148 Md. 682, 689, 130 A. 325 (1925); *Ellerin v. Fairfax Savings Ass'n*, 78 Md.App. 92, 112, 552 A.2d 918, *cert. denied*, 316 Md. 210, 557 A.2d 1336 (1989); *Rispoli v. Jackson*, 51 Md.App. 606, 611, 445 A.2d 349 (1982).

*any recourse against the subscriber, member, enrollee, patient,* or any persons other than the [HMO] acting on their behalf, for services provided in accordance with the provider contract.[16] [Emphasis added.]

Moreover, subsection (*o*) of section 19–710 specifically forbids attempts to collect from subscribers:

(*o*) *Enrollee not liable for covered services; exceptions.—* (1) Except as provided in paragraph (3) of this subsection, individual enrollees and subscribers of health maintenance organizations issued certificates of authority to operate in this State shall not be liable to any health care provider for any covered services provided to the enrollee or subscriber.

(2)(i) A health care provider or any representative of a health care provider may not collect or attempt to collect from any subscriber or enrollee any money owed to the health care provider by a health maintenance organization issued a certificate of authority to operate in this State.

(ii) A health care provider or any representative of a health care provider may not maintain any action against any subscriber or enrollee to collect or attempt to collect any money owed to the health care provider by a health maintenance organization issued a certificate of authority to operate in this State.

The exceptions relate to copayment, uncovered services, etc., not relevant to this appeal.

## Holding

We hold, therefore, that under the contract at issue here and under contracts between HMOs and health care providers generally, Maryland statutory law requires a *health care provider* to look only to the health maintenance organization for payment for any covered services it has performed for the subscribers, members, or enrollees of the HMO, except to the extent *the contract between the provider and the HMO* validly

---

**16.** Another section concerns valid copayments, uncovered services, insurance deductibles, etc. *See* § 19–710(h)(3). The other section, due to the posture of the case *sub judice,* is not applicable.

permits the provider to recover from the subscribers for copayments, which subscribers may be liable for under their separate and distinct membership contract with the HMO.[17] Accordingly, in the case at bar, there was but one contract (as correctly found by circuit court Judges Spellbring and Sotho- ron) between the HMO and appellant. We now shall address the issue of *res judicata.*

## The Law

In *deLeon v. Slear,* 328 Md. 569, 616 A.2d 380 (1992), the Court of Appeals discussed the doctrine of *res judicata* and the underlying rational for its application. The Court stated:

In *Alvey v. Alvey,* 225 Md. 386, 390, 171 A.2d 92 (1961), this Court set forth the traditional rule of res judicata as follows:

"The doctrine of *res judicata* is that a judgment between the same parties and their privies is a final bar to any other suit upon the same cause of action, and is conclusive, not only as to all matters that have been decided in the original suit, but as to all matters which with propriety could have been litigated in the first suit. . . ."

The rule is designed to avoid the " 'expense and vexation attending multiple lawsuits, conserve judicial resources, and foster reliance on judicial action by minimizing the possibilities of inconsistent decisions.' "

The traditional principle of res judicata has three elements: (1) the parties in the present litigation should be the same or in privity with the parties to the earlier case; (2) the second suit must present the same cause of action or claim as the first; and (3) in the first suit, there must have

---

**17.** As HMOs are only liable for services covered by their contracts with providers, providers could not generally maintain suit against the HMOs for uncovered services. Thus, HMOs could not be sued for such services in the first instance. As we have indicated, copayments and uncovered services are not at issue in this appeal.

been a valid final judgment on the merits by a court of competent jurisdiction.

*Id.* at 579–80, 616 A.2d 380 (some citations omitted).

In determining what constitutes the same claim for *res judicata* purposes, the Court of Appeals adopted the "transaction test" in *Kent County Bd. of Educ. v. Bilbrough,* 309 Md. 487, 499, 525 A.2d 232 (1987). In *Bilbrough,* the Court quoted approvingly from section 24 of the Restatement (Second) of Judgments, which provides:

(1) When a valid and final judgment rendered in an action extinguishes the plaintiff's claim pursuant to the rules of merger or bar (see §§ 18, 19), the claim extinguished includes all rights of the plaintiff to remedies against the defendant with respect to all or any part of the transaction, or series of connected transactions, out of which the action arose.

(2) What factual grouping constitutes a "transaction", and what groupings constitute a "series", are to be determined pragmatically, giving weight to such considerations as whether the facts are related in *time, space, origin,* or *motivation,* whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage.

*Restatement (Second) Judgments* § 24 (1982) (emphasis added). Also quoting from the Second Restatement of Judgments, the Court "describe[d] the current approach of courts to answering the same claim-separate claim conundrum." *Bilbrough,* 309 Md. at 497, 525 A.2d 232. The Court noted:

The present trend is to see claim in factual terms and to make it coterminous with the transaction *regardless of the number of substantive theories, or variant forms of relief flowing from those theories, that may be available to the plaintiff;* regardless of the number of primary rights that may have been invaded; and regardless of the variations in the evidence needed to support the theories or rights. The transaction is the basis of the litigative unit or entity *which may not be split.*

*Id.* at 497–98, 525 A.2d 232 (quoting *Restatement (Second) Judgments* § 24 cmt. a (1982) (emphasis added)).

Although the Court of Appeals affirmed the decision of this Court, it noted its concern with our "sole reliance on the same evidence or required evidence analysis." *Id.* at 494, 525 A.2d 232. In the Court of Appeals's view, a restriction to that analysis might "improperly narrow the scope of a 'claim' in the preclusion context." *Id.*

Although the *Bilbrough* Court expanded the concept of claim in the preclusion context, it found that claim preclusion was not applicable. In that case, Bilbrough initially brought a federal court action alleging that "he was terminated for political activity on behalf of candidates for election to the Board [of Education] who were favorable to the then incumbent county superintendent of schools." *Id.* at 490, 525 A.2d 232. In the federal action, summary judgment was entered for the defendants. The subsequent Maryland action involved invasion of privacy claims. In defining the limits of claim preclusion, the Court stated:

> [A] mere change in the legal theory, applied to the same set of facts . . . will not . . . avoid claim preclusion. . . .
>
> . . . .
>
> On the other hand, it is also clear that the scope of a cause of action for *claim* preclusion purposes is *not* as broad as the scope of permissible joinder. . . .

*Id.* at 495–97, 525 A.2d 232 (some emphasis added).

In reaching its conclusion, the Court found that the activities giving rise to the two suits actually occurred at different times and different places. It also found that the prior federal suit was based on a violation of Bilbrough's civil rights, while the Maryland action involved an invasion of privacy claim based upon an improper use of police files, a cover-up of the impropriety, and the spreading of information in a false light. The decision in *Bilbrough,* therefore, was based on factors not applicable to the case *sub judice.* In the case *sub judice,* all actions are based on the same contract up to the time of adjudication.

In *Gertz v. Anne Arundel County*, 339 Md. 261, 661 A.2d 1157 (1995), the *"origin"* and *"motive"* factors of the Restatement's transaction test were the determinative factors. The county, alleging Gertz was not complying with a consent decree, filed a petition for contempt. After the court found Gertz was not in contempt, the county enacted an emergency ordinance directed at Gertz's landfill activities. Gertz then filed a declaratory action, and the county responded with a counterclaim for injunctive relief. The Court, finding the facts were related in time and space, stated:

> Nevertheless, the County's claims originated from different sources. Significantly, the theory of liability in the instant action did not exist when the earlier suit was litigated.... When the contempt action was litigated, the County had no right to proceed against Gertz under the Ordinance because it had not yet been enacted.

*Id.* at 270, 661 A.2d 1157. The Court discussed the motive factor and held that the two claims were motivated by different considerations. The Court reasoned:

> In the contempt action, the County sought to enforce the Consent Agreement and to regulate activity related to land grading. It was not an attempt to regulate Gertz's activities as a sanitary landfill requiring a landfill permit. The motive of the County in the instant action, by contrast, was to enjoin Gertz's activities only until such time as he obtained a landfill permit in compliance with the requirements of the Ordinance.

*Id.* at 270–71, 661 A.2d 1157.

The Court of Appeals explained in *Shum v. Gaudreau*, 317 Md. 49, 562 A.2d 707 (1989), one other consideration that is important in the application of the "transaction" approach to claim preclusion. In *Shum*, the earlier action had been instituted by the landlord pursuant to the provisions of Maryland Code (1974, 1988 Repl.Vol., 1988 Supp.), § 8–401 of the Real Property Article, and the later action was filed pursuant to the lease. Additionally, the first action had been filed for repossession of the premises and for unpaid rent, and the second

action was filed to recover the cost of repairing damage done to the leased premises during the tenancy.

The Court, after citing section 24 of the Restatement (Second) of Judgments, noted that the transaction approach is appropriate

> when " 'parties have ample procedural means for fully developing the entire transaction in the one action. . . .' " As a result of our decision in *Bilbrough,* " '[t]he law of res judicata now reflects the expectation that parties who are given the capacity to present their "entire controversies" shall in fact do so.' "

*Shum,* 317 Md. at 55, 562 A.2d 707 (citation omitted). The Court held that 1) at the core of the two cases was the lease agreement and thus the "facts [were] related in time, space, [and] origin," and 2) it would have been convenient to try the two actions as they both arose from the same contract. *Id.* at 56, 562 A.2d 707. Following a discussion of Maryland cases involving two claims arising out of a single contract, the Court noted that there were two additional considerations in the application of the transaction approach to claim preclusion. The Court explained that the second claim would be precluded if it found: 1) "treatment of all the claims as a unit conformed to the parties' expectations or business usage," and 2) "the initial District Court action allowed Landlord a 'procedural means for developing the entire transaction.' " *Id.* at 57–58, 562 A.2d 707.

The *Shum* Court, finding that the two additional considerations were not met, held that the second action was not barred by claim preclusion. The Court first discussed whether the landlord had a "procedural means" for developing the second claim. It reasoned: "Because the relief available [in the first action based on the statute] . . . is limited to a judgment for repossession of premises and rent actually due, *landlord could not have joined* a claim for general contract damages in that proceeding." *Id.* at 59, 562 A.2d 707 (emphasis added). The Court also found that "[b]ecause of the limited scope of § 8–401, it may well be that neither the

parties' expectations nor business usage would support treating as a unit both rent and other contract claims arising out of the lease." *Id.* at 60, 562 A.2d 707. Accordingly, the Court refused to apply claim preclusion to bar the landlord's second action.

■ In applying the Restatement's transaction test in the case *sub judice*, we are concerned with time, space, origin, motivation, convenience to the trial courts, the parties' expectations, and business usage. We are also aware that the unavailability of procedural means to develop fully the entire transaction, in some cases, may serve as a limitation to the application of claim preclusion.

We have previously opined elsewhere in this opinion that there was but one contract between the HMO (appellee) and appellant in which he agreed to perform all of the services to the HMO's subscribers and to look only to appellee for payment. State statutes prohibited him from proceeding against the subscribers/patients for the same fees under some separate implied contractual or *quantum meruit* bases. Such a contract between an HMO and a provider that we have described is akin to an "open account" in which a party is billed for multiple purchases or performances of services and is paid, or should be paid, for the goods or services on a periodic basis as agreed between the parties. The contract in the case at bar contemplates, and we hold that the parties expected, that multiple services were to be performed under the single contract. Certainly, all of the services performed and bills for services due were related in time under the single contract. Services were to be performed and were performed during the contemplated period and actual period, *i.e.*, the duration of the contract. The trial court found that the other bills at issue were due at the time of the initial District Court suit.

Appellant could have included in his claim at the time of the initial suit all bills then due (even though it might have resulted in a transfer to the circuit court for jurisdictional reasons). The relevant aspects of time (the bills were due),

space (they could have been incorporated), and origin (they were all payments *then* due, *i.e.*, that originated under the single contract), were all present.

Incorporating all of the bills, however complex and time intensive it might have been, would clearly be *more* convenient when contrasted with 60 or 270 separate lawsuits. The phrase "convenient trial" unit must be considered in the context of the alternative. When so considered, the incorporation of all claims then due under the single contract in one suit is, however difficult and complex, convenient.

Motivation for bringing the two suits is, likewise, identical. In both suits, appellant is attempting to recover damages for HealthPlus's alleged breach of the single contract—its alleged failure to comply with the contract's payment provisions.

Moreover, the parties contemplated a continuous revolving performance of services and payment as a part of the contract transaction(s). Additionally, we have previously established and held that the business understanding and custom, to the extent they exist, support a single contract theory between an HMO and a provider and, more important, that the statutes, generally, prohibit a contrary result.

The only remaining test, which may limit the application of the transaction test, is whether appellant, at the time of the prior suit had "ample procedural means to fully develop ... the entire transaction." Clearly, he did. All of the claims for fees for services rendered at or prior to the time of the filing of the subsequent suits could have been combined in one claim against appellee under the single contract between him and appellee at the time of the original suit. Discovery methods could have been used to develop fully the necessary factual information in respect to all of the theretofore submitted bills, regardless of the reasons assigned by HealthPlus for their nonpayment. Stipulation practice, admissions, depositions, interrogatories, presumptions, etc., would be fully available in the action.

Pretrial instructions, opening statements, motions for summary judgment, dismissal, and for judgment, post-trial in-

structions and closing arguments would be used to limit, delimit, or amplify upon, any specific service or bill as the evidence might warrant. Specific, as opposed to general, verdict forms, if necessary, could be utilized. Motions for judgment notwithstanding the verdict would be available to clarify any verdicts further. Motions for new trial or for modification would be available. The trial court, additionally, could utilize remittitur practice to structure further the proceedings in the interests of justice.

It is clear to us that, under the Maryland practice and considering the nature of the dispute under this single contract, ample means existed for all of the fee disputes to have been tried as a single case, and they should have been. Consequently, a consideration of all the factors of the transaction test leads us to conclude that appellant's subsequent actions against HealthPlus constitute the same claim for *res judicata* purposes as the initial claim advanced by appellant in the Vivian Steven's District Court action.

A somewhat old, but similar case, *Ex parte Carlin,* 212 Md. 526, 129 A.2d 827 (1957), involved a claim for fees by an attorney against a client when the arrangement was similar to an open account. In the present case, the contract was with the HMO and was for multiple services performed for the HMO on the HMO's members, *i.e.,* it contemplated multiple services to the HMO's members. In *Carlin,* the contract was with the person for whom the multiple services were rendered. The services in the case *sub judice* were for the HMO although provided to the HMO's subscribers. The differences, if any, are minor in nature.

As relevant to our case, Richard Carlin claimed he was due fees for services he had rendered for the years from 1937 to 1950. The trial court, among other reasons for denying Carlin's claims for fees, found that the fee issue was *res judicata* because Carlin, in a prior proceeding, had petitioned for fees for 1951, 1952, and 1953 without making any claim for the fees generated prior to 1951. The Court held:

His failure to make claim for this sum at the time he sued for ... the years 1951, 1952 and 1953—when he could have just as well then sued for the fees claimed from 1937 to 1953—is a bar to his present suit....

The courts have had considerable difficulty in determining whether or not a contract is entire and indivisible and whether a breach is partial or total, but there is substantial unanimity that even if the contract is divisible, all that is due under it, or by reason of its breach, at the time suit is brought, must then be sued for, or the right to so much as is due but not sued for will be lost.

In the case *sub judice*, the contracting parties were the same. The contract was the same. The claimed breach in the prior suit, nonpayment, was the same breach that was, or could have been, alleged in all the other suits. As we see it, generally, contractual arrangements such as those extant here between an HMO and a provider, when nonpayment occurs, result in a classic case in which the requirement applies that all claims then due must be sued for in any suit for payment for services rendered. *See also MPC, Inc. v. Kenny*, 279 Md. 29, 367 A.2d 486 (1977); *Alvey v. Alvey*, 225 Md. 386, 171 A.2d 92 (1961).

■ We must next determine whether the appellant's negligence claims against Ms. Sheppard would also be precluded by *res judicata* principles. As we explained earlier,

[A] mere change in the legal theory, applied to the same set of facts ... will not ... avoid claim preclusion....

....

On the other hand, it is also clear that the scope of a cause of action for claim preclusion purposes is *not* as broad as the scope of permissible joinder....

*Bilbrough*, 309 Md. at 495–97, 525 A.2d 232.

For the same reasons set forth in the discussion regarding the applicability of claim preclusion to appellee HealthPlus, we find that appellant is also barred from bringing a negligence claim against appellee Sheppard.

In *deLeon v. Slear, supra,* the plaintiff brought a defamation action against a hospital's nurses after he had lost a defamation suit against the hospital based upon the same allegedly defamatory statements. In both suits, the plaintiff claimed that he had been denied hospital privileges because of the defamatory statements relating to his lack of competence. The Court of Appeals identified the specific questions:

> The arguments before us concerning res judicata have primarily centered on two questions: (1) whether the nurses were in privity with a party to the federal action so as to be entitled to avail themselves of the protection of res judicata, and (2) whether this case presents the same claim or claims which Dr. deLeon presented in the federal action.

328 Md. at 581, 616 A.2d 380. Discussing whether privity existed between the hospital and the nurses in the two cases, the Court stated:

> This Court has not squarely decided whether an employee is in privity with his employer, for purposes of res judicata, where a plaintiff brings a tort suit for damages against the employer, loses in the action against the employer, and then sues the employee for damages based upon tortious conduct occurring in the scope of employment and constituting the same "claim" as that involved in the earlier action. Numerous other courts have addressed the issue, however, and have concluded that res judicata bars the plaintiff's suit against the employee in this situation.

*Id.* at 581, 616 A.2d 380 (footnote omitted).

The Court then held that the nurses were "by virtue of their employment relationship ... in privity ... for purposes ... of res judicata." Accordingly, Ms. Sheppard in the case *sub judice,* for *res judicata* purposes, is in privity with HealthPlus. Because no claim can be brought against HealthPlus, no claim, even the negligence claim, can be brought against Ms. Sheppard.

The *deLeon* Court, in a footnote, acknowledged that even if the nurses were not in privity, the result "would not likely be different." *Id.* at 588 n. 5, 616 A.2d 380. The Court explained

that it had relaxed the strict requirements of privity "for purposes of res judicata" where the plaintiff had "a full and fair opportunity to litigate the same claim in the prior proceeding. In these instances, a defendant not in privity ... may invoke the defense...." *Id.*

The actions appellant alleged were performed by Ms. Sheppard were performed by her in her capacity as an employee of HealthPlus. Both the initial and later actions were based, at least in part, on claims that HealthPlus mishandled payments to, and claims for payment made by, appellee. To the extent that the mishandling of these matters was due to Ms. Sheppard's actions, those actions predated the commencement of the prior suit and allegedly continued on. That evidence either was relied on in the prior suit, or should have been. When a suit for contract breach is filed alleging the other party has not performed, that allegation generally incorporates the deficient performance of the employees of the other party such as Ms. Sheppard allegedly giving rise to the nonperformance.

In the case *sub judice*, appellant had "a full and fair opportunity to litigate" in the prior case any negligence on the part of Ms. Sheppard arising out of the contract between appellant and HealthPlus. Appellant failed to do so. He is precluded by *res judicata* from doing so now.

### Resolution

█ We hold, as we indicated earlier, that arrangements, *i.e.*, contracts between health maintenance organizations (HMOs) and health care providers, govern the payment of fees for services rendered to the HMO's members and that the providers ordinarily must look solely to the HMOs, not the subscribers, for payment. Additionally, we hold that when a provider initiates suit against an HMO for fees alleged to be due and owing under the contract between them, the provider

must include all sums then due and owing [18] under the contract to the provider as of the time of the claim, or be precluded under *res judicata* principles from thereafter maintaining a claim for any contested, disputed or delinquent fees payable at the time of the prior proceeding.

For the reasons we have stated, we shall affirm.

**JUDGMENT AFFIRMED; COSTS TO BE PAID BY APPELLANT.**

---

18. "Due and owing" as used here means sums due the provider for which the provider has submitted bills or invoices to the HMO, or should have, and that are "overdue," *i.e.*, they should have already been remitted by the HMO to the provider under the terms of the contract; in the event of due and owing capitation fees not based on actual services rendered to specific subscribers but on a number of members of the HMO selecting the provider, all of the sums to which the provider was entitled to have received as of the date of the filing of suit (filing of the prior suit).