SIXTH DIVISION

May 22, 1998 

No. 1-95-3959

INGA PETROVICH and VUKASIN PETROVICH,

Plaintiffs-Appellants,

v.

SHARE HEALTH PLAN OF ILLINOIS, INC.,

Defendant-Appellee.

)

)

)

)

)

)

)

)

)

Appeal from the

Circuit Court of

Cook County,

Law Division

93 L 6622

The Honorable

Julia M. Nowicki,

Judge Presiding.

             Modified Opinion Upon Denial of Reharing  

JUSTICE QUINN delivered the opinion of the court:

This case is brought on appeal from the trial court's grant of defendant's motion for summary judgment.  The issue on appeal is whether there is a genuine issue of material fact regarding whether plaintiff-appellant's treating doctors were Share Health Plan's (Share) apparent agents.  For the reasons which follow, we reverse the grant of summary judgment.  

Statement of Facts

In 1989, plaintiff's employer, the Chicago Federation of Musicians (CFM), enrolled in the Share health insurance plan.  In August, 1989, plaintiff, a retired member of the CFM, began seeing Dr. Marie Kowalski (Dr. Kowalski) at the Illinois Masonic Medical Center (Illinois Masonic) as her primary care physician.  Plaintiff selected Dr. Kowalski from Share's list of participating physicians.  To be covered under the plan, plaintiff was required to receive primary medical care from Share's list of participating physicians.

In September, 1990, plaintiff went to Dr. Kowalski because she was experiencing persistent pain in the right side of her mouth, tongue, throat and face.  Dr. Kowalski was employed at a satellite facility of Illinois Masonic.  Illinois Masonic was under contract with Share.  

In October, 1990, Dr. Kowalski referred plaintiff to two other Share physicians, Dr. Slavick, a neurologist, and Dr. Friedman, an independent ear, nose and throat specialist.  Both Dr. Slavick and Dr. Friedman had contracts with Share.  

Dr. Friedman recommended that plaintiff have a magnetic resonance imaging test (MRI) or computed tomography (CT) scan done on the base of her skull.  Plaintiff testified that Dr. Kowalski said that Share would not allow new scans.  Plaintiff did not call Share, as she did not know at that time that Share had a grievance procedure.  Dr. Kowalski gave Dr. Friedman a copy of an old MRI test result.  Apparently, sometime later, Dr. Kowalski ordered an updated MRI.  The MRI was performed on October 31, 1990.  On November 19, 1990, plaintiff had a follow-up visit with Dr. Kowalski during which they discussed the results of the MRI.  Plaintiff testified that Dr. Kowalski told her nothing was there. 

In May, 1991, Dr. Kowalski again referred plaintiff to Dr. Friedman.  This was plaintiff's third visit to Dr. Friedman.  On this visit, Dr. Friedman examined plaintiff and observed that plaintiff's tongue was tender, and plaintiff informed him that there was pus in her mouth.  On June 7, 1991, Dr. Friedman performed multiple biopsies on the right side of the base of plaintiff's tongue.  The biopsy results showed squamous cell carcinoma in the base of plaintiff's tongue, and in the surrounding tissues of the pharynx.  Dr. Kowalski had never told plaintiff that she suspected cancer.  

On June 25, 1991, Dr. Friedman operated on plaintiff and removed a six-centimeter portion of the base of plaintiff's tongue, part of her palate, and a portion of her pharynx and jaw bone.  After the surgery, plaintiff underwent radiation treatments and rehabilitation.  

Plaintiff alleges that Share's physicians, Dr. Kowalski and Dr. Friedman, negligently failed to diagnose the cancer sooner, and that Share is vicariously liable under an apparent agency theory. 

On appeal, the arguments of both defendant and plaintiff rely on Share's organization and structure, and certain representations made in the materials Share allegedly provided to plaintiff.  These facts are briefly summarized here.  

The Illinois Health Maintenance Organization Act (HMO Act) provides for two types of health maintenance organizations (HMOs):  (1) staff model HMOs, which are physician-sponsored and provide care directly through salaried physicians in medical centers run by the HMO; and (2) independent practice association (IPA) model HMOs, which arrange for health care by contracting with independent medical groups and paying them.  215 ILCS 125/1-2(7) (West 1994).  Share is an IPA model HMO, meaning that Share contracts with independent medical groups, rather than directly employing them.  

Share provides a list of participating physicians to its members.  Each member then selects a primary care physician, who is responsible for the overall care of each patient, and makes referrals when necessary.  Each primary care physician must go through an application procedure to join Share.  

The Share member handbook specifically states to its members that the primary care physician is "your health care manager" who "makes the decisions" about the member's care.  The member handbook also stated that Share would provide "all your healthcare needs" and "comprehensive quality services."  

The subscriber certificate, or "benefits contract," section 8.5, states that Share's physicians are independent contractors and that "SHARE Plan Providers and Enrolling Groups are not agents or employees of SHARE nor is SHARE or any employee of SHARE an agent or employee of SHARE Plan Providers or Enrolling Groups."  The subscriber certificate further provided the following:  

"The relationship between a SHARE Plan Provider and any Member is that of provider and patient.  The SHARE Plan Physician is solely responsible for the medical servies provided to any member.  The SHARE Plan Hospital is solely responsible for the Hospital services provided to any Member."

Plaintiff testified at her evidence deposition that she received and read portions of the member handbook but did not remember receiving the subscriber certificate.  

Both the contract between Illinois Masonic and Share and the contract between Dr. Friedman and Share contained a disclaimer that Illinois Masonic's physicians were not agents of Share.  The contracts stated the following:  "It is understood and agreed that [Illinois Masonic] and primary care physicians are independent contractors and not employees or agents of Share."  However, plaintiff testified in her evidence deposition that she did not know what Dr. Kowalski's or Dr. Slavick's relationship was with Share.  

Share employed a method of payment referred to as a "capitation" system, meaning that Share paid its participating physicians a fixed amount of money per month for each patient assigned to that physician.  The cost of any services the primary care physician would provide was charged against that physician's capitation account, except for hospitalizations and other services, which were charged against a separate account.  The costs of medical procedures and tests were deducted from the physician's capitation account.  All consulting physician's fees were deducted from the primary care physician's capitation account.  The primary care physician would then retain the surplus left at the end of the month in the capitation account.  

Share's primary care physicians were required under their contract with Share to approve each of the patient's medical requests and referals to specialists.  The primary care physicians were required to use Share's standard referral forms.  However, Dr. Kowalski testified at a discovery deposition that she did not need to consult with representatives from Share in order to make referrals, and did not feel constrained in making any decisions regarding her patients.  

Share's agreement with its members provided that, if the member sought care outside of the Share network of participating physicians, Share would not cover the cost.  Share would also not pay the cost if a member sought the care of a specialist without a referral from the Share primary care physician, or bought any medical services or supplies without the approval of the Share primary care physician.   

Also, at the time plaintiff filed her complaint, Share had a quality assurance program in place to ensure that the primary care physicians complied with the standard of care.  Share complied with the Illinois Department of Public Health Guidelines by conducting a retrospective review once every two years by checking the patients' charts for notation of allergy status, problem medication listing, and children's physicals and current immunization.  However, Share conducted more intense reviews as well.  Dr. Kowalski testified at her discovery deposition that a Share representative would come to the office and look at the patients' charts at least once a year.  A condition to being a Share primary care physician was that one had to allow Share representatives access to Share members' records to assure the patients were cared for in an appropriate manner.  Susan Kirkwood (Kirkwood), the quality assurance manager at Share, testified at her discovery deposition that Share monitored for substandard care, and that there were penalties for doctors that ranged from being terminated from the Share network to sending a letter with educational information.  In addition to this review, every patient complaint, whether it was a telephone call or letter, would be reviewed.  However, the Share quality review task force never conducted a review of plaintiff's case, because, according to Kirkwood, Dr. Kowalski refused to release plaintiff's medical records.  

After hearing arguments, the trial court granted defendant's motion for summary judgment.  

Discussion

The sole issue presented on appeal is whether the trial court erred in granting defendant's motion for summary judgment.  The purpose of summary judgment is not to try a question of fact, but to determine whether one exists.  
Gilbert v. Sycamore Municipal Hospital
, 156 Ill. 2d 511, 517, 622 N.E.2d 788 (1993).  A motion for summary judgment should be granted only where the pleadings, depositions, admissions and affidavits show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law.  735 ILCS 5/2-1005(c) (West 1994).  In determing whether there is a genuine issue as to any material fact, courts must construe the pleadings, depositions, admissions, and affidavits strictly in favor of the movant and liberally in favor of the non-movant.  
Gilbert
, 156 Ill. 2d at 518.  A triable issue exists where there is a dispute as to material facts or where, although the facts are not in dispute, reasonable minds might differ in drawing inferences from those facts.  
Raglin v. HMO Illinois, Inc.
, 230 Ill. App. 3d 642, 645, 595 N.E.2d 153 (1992).  Summary judgment is recognized to be a drastic remedy that is properly granted only where the movant's right to it is clear and free from doubt.  
Gilbert
, 156 Ill. 2d at 518.  Review in the appellate court of a grant of summary judgment is 
de novo
.  
 

The trial court granted defendant's motion for summary judgment after finding that there was no genuine issue of material fact as to the issue of whether the doctors who treated plaintiff were agents of Share under the theory of apparent authority.  The issue underlying this case is whether a health maintenance organization can be vicariously liable for the negligence of its participating physicians in a nonemergency standard referral situation.  There have been no published opinions on the vicarious liability of an HMO since 
Gilbert
, 156 Ill. 2d 511, 622 N.E.2d 778.

It has been recognized that HMOs are not immune from liability.  
Raglin
, 230 Ill. App. 3d at 646.  "However, a lack of immunity from prosecution for malpractice does not mean 
a fortiori
 that HMOs may be held strictly liable for any injury that might occur to one of their medical care plan subscribers during the course of medical treatment."  
Raglin
, 230 Ill. App. 3d at 646.  Rather, there must be some recognized legal theory under which an HMO can be held liable.  

In Illinois, HMOs can be held liable for medical malpractice based on the following theories:  (1) vicarious liability through 
respondeat
 
superior
 or ostensible or apparent agency; (2) corporate negligence as a result of negligent selection and control of the physician who rendered care; or (3) corporate negligence as a result of the corporation's independent acts of negligence.  
Raglin
, 230 Ill. App. 3d at 646.  HMOs could also be liable for malpractice under a breach of contract or breach of warranty theory.  
Raglin
, 230 Ill. App. 3d at 646.  

Plaintiff's case is based only on the theory of vicarious liability through apparent agency.  The doctrine of apparent authority is more commonly applied in contracts cases, but it is applicable in torts cases where "the injury would not have occurred but for the injured party's justifiable reliance on the apparent agency."  
Gilbert
, 156 Ill. 2d at 524.  The doctrine of apparent authority has been used in the context of hospitals and hospital emergency rooms.  See 
Gilbert
, 156 Ill. 2d 511, 622 N.E.2d 788.  However, nothing in the case law suggests that the doctrine of apparent authority cannot be applied in the context of an HMO case.

The apparent agency of an HMO can be established by a showing that the HMO, "by its actions or statements, led a third party, who may have been unaware of the independent contractor relationship, to believe that the physicians were controlled by" the HMO.  
Raglin
, 230 Ill. App. 3d at 647.  The elements of apparent authority thus are: (1) a "holding out" of the party who was alleged to be negligent as an agent; and (2) reasonable reliance by a third party on the principal's conduct.  See 
Raglin
, 230 Ill. App. 3d at 647-650; 
Gilbert
, 156 Ill. 2d at 523.  See also Restatement (Second) of Agency, §§ 265, 267 (1957).  

The apparent authority theory focuses on "holding out" someone as an agent and reasonable reliance by a third party on such representations.  See 
Raglin
, 230 Ill. App. 3d at 647-650; 
Gilbert
, 156 Ill. 2d at 525-526.  As the court in 
Gilbert
 put it:

"Apparent authority in an agent is the authority which the principal knowingly permits the agent to assume, or the authority which the principal holds the agent out as possessing.  It is the authority which a reasonably prudent person, exercising diligence and discretion, in view of the principal's conduct, would naturally suppose the agent to possess."  
Gilbert
, 156 Ill. 2d at 523.  

Whether a person has notice of an agent's lack of authority is a question of fact.  
Gilbert
, 156 Ill. 2d at 524.  

As this court recognized in 
Raglin
, vicarious liability through the doctrine of apparent authority had already been utilized to hold a hospital liable for the actions of its doctors, despite the fact that an independent contractor relationship may have existed between the hospital and the doctor.  
Raglin
, 230 Ill. App. 3d at 648.  The doctrine of apparent authority in the context of an HMO had not been utilized in Illinois, but had been employed in other jurisdictions.  
Raglin
, 230 Ill. App. 3d at 648.  

The leading case on the issue of the apparent authority of a physician participating in an HMO in Illinois is 
Raglin
, 230 Ill. App. 3d 642, 592 N.E.2d 15, where this court affirmed a grant of summary judgment in an action based on apparent authority theory against an HMO. 

In Illinois, an HMO has not yet been held liable under the theory of apparent authority.  However, HMOs have been held liable under a vicarious liability theory in other jurisdictions.  For example, the Pennsylvania superior court, under substantially the same facts as the present case, reversed a grant of summary judgment in favor of an HMO on the issue of apparent agency.  
Boyd v. Albert Einstein Medical Center
, 377 Pa. Super. 609, 547 A.2d 1229 (1988).  In 
Boyd
, the HMO contract stated that the HMO would provide "`health care services and benefits to Members in order to protect and promote their health.'"  
Boyd
, 377 Pa. Super. at 621, 547 A.2d at 1235.  Members of the HMO paid their physicians' fees to the HMO, and not directly to the doctors.  
Boyd
, 377 Pa. Super. at 621, 547 A.2d at 1235.  The primary care physicians were screened by the HMO and had to comply with its rules.  
Boyd
, 377 Pa. Super. at 621, 547 A.2d at 1235.  The members were provided a limited list of primary care physicians from which they were required to choose.  
Boyd
, 377 Pa. Super. at 621, 547 A.2d at 1235.  Also, the members could not see specialists without their primary care physicians' referrals, and had no choice of specialists.  
Boyd
, 377 Pa. Super. at 621, 547 A.2d at 1235.  The 
Boyd
 court held that, because the plaintiff-appellant's decedent could not directly see a specialist, but, rather, was required to go through the HMO, there existed an "inference that appellant looked to the institution for care and not solely to the physicians."  
Boyd
, 377 Pa. Super. at 621, 547 A.2d at 1235.  

This case is similar to 
Boyd
, in that there is evidence that plaintiff looked to Share to provide her medical care.  Here, there is a genuine issue of material fact as to whether Share held its physicians out to be its apparent agents through its representations, and whether plaintiff reasonably relied on these representations.  

Plaintiff presented evidence which showed that Share's compensation arrangements with its doctors and its referral system may have constrained its physicians' medical decisions and that Share maintained some control over its physicians through its quality assurance program. 

Share's use of the capitation system could lead to the reasonable inference that Share's method of compensation to its participating physicians created a disincentive to order tests or make referrals and thus exerted control over its physicians' medical decisions.  Here, plaintiff testified at her deposition that Dr. Kowalski told her that Share would not pay for more tests.  This evidence was relevant to whether plaintiff was led to believe that Dr. Kowalski was controlled by Share.  See 
Raglin
, 230 Ill. App. 3d at 647.  A third party could have reasonably relied on such a statement to believe that was Dr. Kowalski was an agent of Share because Share made decisions as to what medical care would be provided.  While Dr. Kowalski denied making this statement, there is a question of fact as to whether the representations made by Share reasonably lead plaintiff to believe that Dr. Kowalski was Share's employee and was under Share's control.

There is also evidence that Share held its physicians out as its agents through the quality assurance program.  Defendant cites 
Raglin
, 230 Ill. App. 3d 642, 595 N.E.2d 153, in arguing that a quality assurance program cannot provide a basis to establish apparent agency.  However, Share's quality assurance program is different than that in 
Raglin
. 

Raglin
 held that the quality assessment program and review guidelines established by the HMO in that case to comply with the HMO Act (215 ILCS 125/1-1 
et seq
 (West 1994)), are "not the type of control from which agency arises."  
Raglin
, 230 Ill. App. 3d at 649.  In 
Raglin
, the quality assessment program consisted merely of administratively tracking the independent medical groups in its network to determine whether they were complying with the rules of the HMO.  
Raglin
, 230 Ill. App. 3d at 649.  The HMO only required the physicians to provide documentation that they were following certain procedures, and it did not review the contents of the documentation to assess the accuracy of diagnoses.  
Raglin
, 230 Ill. App. 3d at 649-50.  

Here, unlike 
Raglin
, the quality assessment program was not simply a way of "tracking" the independent medical groups to ensure that they were following the HMO's rules and certain minimum health care standards.  Rather, there is evidence that Share monitored specifically for substandard care, periodically reviewing the contents of patients' charts to ensure that they were current and that certain conditions were noted.  Also, Share's quality assurance manager testified in her discovery deposition that Share conducted an investigation for every patient complaint.  There were penalties for doctors that ranged from being terminated from the Share network, to receiving a warning letter with educational information for the physician.  Thus, the scope of Share's quality assurance program in this case goes beyond that in 
Raglin
.  The evidence presented by plaintiff supports her claim on this issue and creates a genuine issue of material fact.  

There is further evidence that Share held its physicians out as its apparent agents in Share's documents.  

Defendants maintain that the legal relationship of Illinois Masonic, and Illinois Masonic's physicians, to Share was that of independent contractors.  The subscriber certificate stated the following:

"Relationship Between Parties.  The relationships between Share and Share Plan Providers, and between Share and Enrolling Groups are contractual relationships between independent contractors.  Share Plan Providers and Enrolling Groups are not agents or employees of Share nor is Share or any employee of Share an agent or employee of Share Plan Providers or Enrolling Groups.

The relationship between a Share Plan Provider and any Member is that of provider and patient.  The Share Plan Physician is solely responsible for the medical services provided to any Member.  The Share Plan Hospital is solely responsible for the Hospital services provided to any Member."  

However, plaintiff disputes that she ever received the subscriber certificate.  Moreover, an agency relationship can be inferred despite a physician's legal relationship to an HMO.  See 
Raglin
, 230 Ill. App. 3d at 647.  Whether an agency relationship can be inferred is a factual issue.  
Raglin
, 230 Ill. App. 3d at 647.  

Based on Share's representations holding its physicians out to be its agents, it is possible to infer an agency relationship between the physicians and Share.  Share's subscriber certificate stated that the Share primary care physician "is solely responsible for the medical services provided to any member."  However, despite this statement, Share's member handbook stated to its members that 
Share
 would provide "all your healthcare needs," and that each member's primary care physician is "your health care manager."  The primary care physicians were required to use Share's standard referral forms when making referrals for patients to see specialists.  Plaintiff paid her fee to Share, and not directly to either Dr. Kowalski or Dr. Friedman.  Also, plaintiff alleges that she was led to believe that Dr. Kowalski was Share's agent because Dr. Kowalski told her that Share would not pay for more tests.  Thus, it is possible to infer from this evidence that Share was holding out its physicians to be its agents.  

Defendant analogizes Share's statement in its subscriber certificate that the physicians are responsible for each member's medical care to the subsriber certificate in 
Raglin
, which stated that the HMO "did not directly furnish medical care and could not make medical judgments."  
Raglin
, 230 Ill. App. 3d at 650.  However, here, unlike 
Raglin
, there were further representations in Share's member handbook which could be interpreted as holding out the physicians in Share's network as Share's agents.  

Here, the member handbook is similar to the one in 
Boyd
, 377 Pa. Super. 609, 547 A.2d 1229.  Share's member handbook referred to the members' selected physicians as the "Share Plan Primary Care Physician."  Like Share's member handbook, the HMO group contract in 
Boyd
 stated that it would "[provide] health care services and benefits to Members in order to protect and promote their health ***."  
Boyd
, 377 Pa. Super. at 621, 547 A.2d at 1235.  As in 
Boyd
, Share's statements in its member handbook creates an issue of material fact as to whether the physicians were Share's apparent agents.  

Finally, there is also a genuine issue of material fact as to the reasonable reliance element of apparent agency.  

The trial court erred in its ruling that plaintiff could not show reasonable reliance as a matter of law because the legal relationship of Share to its participating physicians was set out in the subscriber certificate and member handbook.  The trial court focused on the fact that plaintiff admitted that she read some of the documents given to her by Share, but not all of them, and ruled that this did not consitute reasonable reliance as a matter of law.  The trial court stated the following in its ruling:  

"If I were to allow that kind of reliance to stand as reasonable, then anyone could pick and choose a few words out of a contract in any situation and argue that their reliance on those selections were reasonable; and I think that *** we therefore have a situation where any particular plaintiff could make self-imposed limitations on information and argue reliance.

But over and above that, if I look at everything that we have here from the Share contract, benefit contract here, I think that they have done what they are required to do.  This information was not hidden anyway.  It is set out as to what the relationship of the parties is.  

If this particular plaintiff does not understand the legal significance of that, I don't think it is up to this court to provide that bridge for her ***."  

The court erred in its ruling because the legal relationship between Share and its physicians set out in Share's documents does not preclude the inference that Share's participating physicians were its apparent agents.  An agency relationship can be inferred despite a physician's legal relationship to an HMO.  
Raglin
, 230 Ill. App. 3d at 647.  Thus, the fact that plaintiff may not have read all of the documents given to her by Share is not dispositive where there is other evidence of "holding out" on which plaintiff could have reasonably relied.  There were conflicting representations within the documents the trial court relied on in granting summary judgment.  While the subscriber certificate contained an independent contractor disclaimer clause, the member handbook stated that it would provide Share's members with "all your healthcare needs."    

In addition, plaintiff was denied the opportunity to make a further showing on the element of reasonable reliance because she was foreclosed from obtaining further discovery of defendant's advertising materials by the grant of summary judgment.  These advertising materials would go to the elements of "holding out" and justifiable reliance.  Here, the grant of summary judgment was premature, and effectively foreclosed plaintiff from an opportunity to make a further showing on the "holding out" element of the apparent agency doctrine.  

Plaintiff's argument as to the modern reality regarding the aggressive advertisement of HMOs is compelling.  Although 
Raglin
, 230 Ill. App. 3d 642, 595 N.E.2d 153, represents the most recent case law on the vicarious liability of HMOs, 
Gilbert
, 156 Ill. 2d 511, 622 N.E.2d 788, decided after 
Raglin
, looked to the "realities of modern hospital care" in reversing a grant of summary judgment in the defendant hospital's favor on the issue of vicarious liability.  
Gilbert
, 156 Ill. 2d at 520-522.  One reality the supreme court discussed was the business aspect of modern hospitals, and the other reality was the reasonable expectations of the public.  
Gilbert
, 156 Ill. 2d 520-521.  Our supreme court quoted the Wisconsin Supreme Court in stating the following:

"[H]ospitals increasingly hold themselves out to the public in expensive advertising campaigns as offering and rendering quality health services.  One need only pick up a daily newspaper to see full and half page advertisements extolling the medical virtues of an individual hospital and the quality health care that the hospital is prepared to deliver in any number of medical areas.  Modern hopitals have spent billions of dollars marketing themselves, nurturing the image with the consuming public that they are full-care modern health facilicites.  All of these expenditures have but one purpose:  to persuade those in need of medical services to obtain those services at a specific hospital.  In essense, hospitals have become big business, competing with each other for health care dollars."  
Gilbert
, 156 Ill. 2d at 520, quoting 
Kashishian v. Port
, 167 Wis. 2d 24, 38, 481 N.W.2d 277, 282 (1992).  

The supreme court further stated:

"The realities of modern hospital care raise a serious question regarding the responsibility of a hospital when a physician who is an independent contractor renders negligent health care.  Can a hospital always escape liability for the rendering of negligent health care because the person rendering the care was an independent contractor, regardless of how the hospital holds itself out to the public, and regardless of the perception created in the mind of the public?"  
Gilbert
, 156 Ill. 2d at 522.  

Likewise, the same public policy argument applies to HMOs, whose aggressive advertising campaigns arguably create an expectation in the public that they are providers of health care.  As plaintiff argues, HMOs should not be allowed to hold themselves out as total providers of health care and then seek to avoid liability based on a disclaimer buried in a contract.  Defendant's reliance on 
Raglin
, 230 Ill. App. 3d 642, 595 N.E.2d 153, is unpersuasive, as the facts of the present case go well beyond the facts in 
Raglin
.  Not every HMO holds itself out in the same manner, and thus a grant of summary judgment is not always appropriate.  

Lastly, defendant raises a statute of limitations defense as to Dr. Friedman, contending that plaintiff's amended complaint, which added allegations of Dr. Friedman's negligence for the first time, was filed after the statute of limitations expired.  This argument is without merit.  Plaintiff had no obligation to name Dr. Friedman in the complaint, because plaintiff's cause of action is against Share under a theory of vicarious liability, and not directly against Dr. Friedman for his individual negligence.  Thus, Dr. Friedman is not a party who ought to have been named in the original complaint.  See 735 ILCS 5/2-616(a) (West 1994).  

For the reasons stated above, we hold that the instant case presents a genuine issue of material fact as to whether plaintiff's treating physicians were apparent agents of Share.  Thus, we reverse the trial court's grant of summary judgment in defendant's favor.  

Reversed.  

Campbell, P.J., and Zwick, J., concur.