Fourth Division

November 12, 1998

No. 1-97-3821

SHEILA JONES, Individually and as )  APPEAL FROM THE

Mother and Next Friend of SHAWNDALE )  CIRCUIT COURT OF

JONES, a Minor, )  COOK COUNTY.

)

Plaintiff-Appellant, )

)

v. )

)

CHICAGO HMO LTD. OF ILLINOIS and ROBERT )

A. JORDAN, M.D., )  HONORABLE

)  JAMES M. VARGA,

Defendants-Appellees. )  JUDGE PRESIDING.

JUSTICE WOLFSON delivered the opinion of the court:

Given the expanding role of managed health care the issues raised in this medical negligence lawsuit were bound to reach the courts.

Sheila Jones (Jones), individually and as mother of Shawndale Jones (Shawndale), presents three separate legal theories in her effort to hold Chicago HMO liable for the negligent acts of one of its contract doctors.  The trial court granted summary judgment to the defendant, rejecting all three theories.  We agree there was no fact issue meriting a trial on two of those theories, but we find summary judgment was erroneously granted on a third.

Jones' second amended complaint against Chicago HMO consists of three counts.  Count I is entitled "Institutional Negligence,"

another way of referring to independent corporate negligence.

Count II is entitled "Vicarious Liability," and contends Chicago  HMO, as principal, is liable for the negligent acts of its agent, Dr. Robert A. Jordan (Dr. Jordan).  Count III, referred to as "Contract Liability," contends Chicago HMO breached its contractual obligations to the plaintiff.

Thus far, two Illinois decisions have dealt with the question of whether a health maintenance organization (HMO) may be held liable for the negligence of a contract physician.

The first was 
Raglin v. HMO Illinois, Inc.
, 230 Ill. App.  3d 642, 595 N.E.2d 153 (1992).  The second was 
Petrovich v. Share
  
Health Plan
, 296 Ill. App. 3d 849, 696 N.E.2d 356 (1998), 
pet. for leave to appeal granted
 No. 85726 (October 6, 1998).

Both cases observed that a potential exists for HMOs to be held liable for medical malpractice under more than one theory.

Raglin
 held, and 
Petrovich
 agreed, the theories include:

"(1) vicarious liability on the basis of 
respondeat superior
 or ostensible agency; (2) corporate negligence based upon negligent selection and negligent control of the physician; and (3) corporate negligence based upon the corporation's independent acts of negligence, 
e.g.
, in the management of utilization control systems.  Contract law might also be utilized to hold HMOs liable for malpractice based on breach of contract or breach of warranty."  
Raglin
, 230 Ill. App. 3d at 646.

Accord 
Petrovich
, 296 Ill. App. 3d at 855.

Raglin
 cited an article in the American Bar Association's Tort and Insurance Law Journal as the sole support for its summary of available theories.  
Petrovich
 cited 
Raglin
.  The only issues actually decided in those cases had to do with vicarious liability.  Until now, no Illinois medical malpractice case has dealt with claims of HMO independent corporate negligence and breach of contract with covered patients.

Raglin
 and 
Petrovich
 stand for the proposition that while HMOs are not immune from civil prosecution for malpractice, some recognized legal theory must be satisfied before liability can attach.

With that background, we turn to the facts necessary for consideration of the issues in this case.

FACTS

There are two contracts to examine in this case.  One is the 1990 "AGREEMENT FOR FURNISHING HEALTH SERVICES" between Chicago HMO and the Illinois Department of Public Aid (IDPA) to provide

health care services to Medicaid recipients ("Beneficiaries").

Jones, a Medicaid recipient, and her children fall under the agreement's definition of beneficiaries.

The second contract is the 1990 agreement between Chicago HMO and Dr. Jordan, the pediatrician charged with negligence in this case.

The preamble to the agreement between Chicago HMO and IDPA

said: "[Chicago HMO] meets the State Plan definition of an HMO, namely that [Chicago HMO] *** is organized primarily for the purpose of providing health care services ***."  The preamble continued: "[Chicago HMO] warrants that it is able to provide the medical care and services required under this Agreement in accordance with prevailing community standards, and is able to provide these services promptly, efficiently, and economically ***."

Article V of this agreement also described Chicago HMO's duties.  In Article V, section (b), Chicago HMO agreed to "*** provide or arrange to have provided all covered services to all Beneficiaries under this Agreement."  In Article V, section (m), Chicago HMO further agreed to "*** provide all Beneficiaries with medical care consistent with prevailing community standards ***" and to implement a quality control program in compliance with federal regulations.  In Article V, section (n), Chicago HMO agreed to afford each Beneficiary a primary care physician (PCP) to supervise and coordinate medical care.  Section (n) of the agreement provided:

"There shall be at least one full-time equivalent, board eligible physician to every 1,200 [Beneficiaries], including one full-time equivalent, board certified primary care physician for each 2,000 [Beneficiaries].  *** There shall be *** one pediatrician for each 2,000 [Beneficiaries] under age 17."

Article V, section (q)(3) of the agreement said: "[Chicago HMO] shall remain responsible for the performance of the subcontractor [physicians]."  Article IX, section (l) of the agreement said: "The relationship of [Chicago HMO] to the [IDPA] arising out of this Agreement shall be that of an Independent Contractor."  

A "MEDICAL SERVICE GROUP AGREEMENT" described the relationship between Chicago HMO and Dr. Jordan:

"The [HMO] and the [physician] are separate and independent entities, and each is an independent contractor.  Neither party is the partner, agent or representative of the other; neither shall have any direction or control over the manner in which the other performs its services and functions; each is free to enter into contracts with other entities ***."

This agreement also listed Dr. Jordan's duties in detail.  Dr. Jordan would provide to Chicago HMO subscribers specified medical services "*** of good quality and in accordance with accepted medical and hospital standards of the community;" maintain medical records "*** in such form as required by the medical director of [the HMO] and make these records available to the HMO for inspection; and "*** cooperate with and participate in the Quality Assurance and Utilization Review Programs of the [HMO] ***."  Additionally, under a "PUBLIC AID AMENDMENT TO THE MEDICAL GROUP SERVICE AGREEMENT," Dr. Jordan agreed "*** to abide by any conditions imposed by the [HMO] as part of the [HMO's] agreement with the [IDPA]."

According to Dr. Jordan, Chicago HMO contract physicians would use their own medical judgment to decide on an HMO subscriber's course of treatment.  However, under the agreement, this medical judgment was subject to review: if Chicago HMO disagreed with the physician about the medical necessity of certain treatment, an independent review physician, jointly selected by the subscriber, the contract physician, and Chicago HMO would determine medical necessity.

In his deposition, Dr. Jordan testified Chicago HMO representatives would periodically visit his office to conduct audits.  Chicago HMO's medical director (or "Vice President of Medical Affairs") Mitchell Trubitt (Trubitt) acknowledged in his deposition, "Part of our [Chicago HMO's] job is to review the quality of care given."  Trubitt described Chicago HMO's "Total Quality Management Program" as "a new generation of our quality management program."  Trubitt said, "*** the concept is that there is a more organized way of reviewing quality issues, of identifying potential issues and creating interventions to allow improvement."  If a physician did not comply with the conclusions of Chicago HMO's auditors, Trubitt said Chicago HMO could cancel the physician's contract.

Dr. Jordan testified Chicago HMO collected and allocated subscriber fees into different pools.  Under the agreement, Chicago HMO would pay for Dr. Jordan's services from one of these pools by a monthly capitation system.  The agreement detailed this system in an appendix: Dr. Jordan would receive a specified dollar amount for specified demographic groups per month, regardless of the services he rendered.  For example, for each female patient under two years old, Dr. Jordan would receive $34.19 per month whether or not he treated these patients.

Dr. Jordan received additional compensation through a "medical incentive fund."  Trubitt described the incentive fund in his deposition as a fund containing "premium revenues" which covered: "Inpatient hospital costs.  And other items such as home health costs, durable medical equipment costs.  There are a variety of items that were allocated to that fund."  When a patient required hospitalization, Chicago HMO would pay those costs from this fund.  Trubitt testified physicians would receive 60% of the remaining, unused balance of the fund at the end of each year.  

Dr. Jordan testified he was the PCP for 3,000 Chicago HMO subscribers and he contracted with 20 other HMOs to provide medical care for 1,500 other patients.  Trubitt testified Federal regulations limit HMO pediatricians to 3,500 patients.  In 1990, Chicago HMO's records indicated Dr. Jordan was PCP for 4,527 Chicago HMO subscribers.

Jones testified in her deposition she did not pursue Chicago HMO to provide her medical care.  Instead, in 1986, she received a house call in Park Forest from a Chicago HMO representative.  According to Jones, the Chicago HMO representative:

"*** was telling me what it [managed care] was all about, that [Chicago] HMO is better than a regular medical card and everything so I am just listening to him and signing my name and stuff on the papers.

* * *

I asked him what kind of benefits you get out of it and stuff, and he was telling me that it is better than a regular [Medicaid] card."

The "HMO ENROLLMENT UNDERSTANDING" signed by Jones in 1987 provided, "I [Jones] understand that all my medical care will be provided through the Health Plan once my application becomes effective."

Jones testified that somehow Chicago HMO knew when she moved to Chicago Heights in 1990: "[T]hey [Chicago HMO representative Edwardo Feliciano] came to my house, and I signed it [a 1990 subscription agreement]."  Neither Chicago HMO nor Jones arranged this meeting in advance, although Jones said she may have completed a change of address form.  Instead, "*** they [Chicago HMO] would be in the building knocking from door to door."  

Jones also testified she did not select Dr. Jordan as her PCP when she moved from Park Forest to Chicago Heights:

"Dr. Jordan's name got mentioned when I first got on [Chicago] HMO [in Chicago Heights].  They gave me--

that's who they gave me, Dr. Jordan.  They didn't ask me if I wanted a doctor.  They gave me him.

* * *

*** They told me that he was a good doctor, and they was like--I was like who is he, and they told me he was a good doctor for the kids because I didn't know what doctor to take my kids to because I was staying in Chicago Heights so they gave me him so I started taking my kids there to him."

According to Trubitt, Dr. Jordan was the only Chicago HMO PCP in Chicago Heights willing to accept Medicaid recipients: "At that point in that area there was no choice."

Jones knew of Dr. Jordan only through Chicago HMO and did not ask about other pediatricians in the area because "they gave me him."  Jones also did not ask about the legal relationship between Chicago HMO and Dr. Jordan, although in its answers to Jones' interrogatories, Chicago HMO asserted: "Plaintiff had the option of inquiring of either Dr. Jordan or Chicago HMO, Ltd. as to the relationship between the two."  When asked whether she knew Dr. Jordan treated subscribers to other HMOs, Jones replied: "No.  I just thought it was one HMO.  I don't know."

Dr. Jordan testified he had no Chicago HMO insignia in his office and did not wear Chicago HMO identification when treating patients.  Dr. Jordan and Jones both testified she did not ask about his educational background, his board certification, or his experience with malpractice allegations when she first visited his office.  Although Jones never saw any Chicago HMO insignia or identification around Dr. Jordan's office, she said she did notice Chicago HMO literature in his office: "I seen something in there with [Chicago] HMO on it.  I knew that they deal with [Chicago] HMO." 

Jones testified she did not remember receiving Chicago HMO literature, but she conceded if she received any literature, she could not remember reading it.  In his deposition, Trubitt said he accepted that subscribers could not assimilate the information in Chicago HMO's literature.

Chicago HMO's "Member's Handbook" told new subscribers: 

"The Chicago HMO staff and doctors want to serve your health care needs and make your relationship with us a good one.  Please read this booklet.  It tells you how to get benefits and services from [Chicago HMO].

Chicago HMO provides complete medical care when you are sick.  But that is not all.  We offer many important services in our effort to help you protect your health and your family's health."

The handbook contained certain procedures, including telephoning "your Chicago HMO personal doctor" before seeking medical care, except in "severe emergencies."  The handbook referred to subscriber PCPs as "your Chicago HMO personal doctor," "your own Chicago HMO doctor," "your Chicago HMO doctor," and "Chicago HMO primary care physician."   The handbook also noted, "Chicago HMO has a contract with the [IDPA] to provide service to beneficiaries of the Medical Assistance Programs under the AFDC-MAG Program" and listed the services Chicago HMO provided and did not provide.  The handbook did not address the legal relationship between Chicago HMO and its contract physicians and did not mention Chicago HMO's quality management program.

On January 18, 1991, Jones' three-month old daughter Shawndale became sick.  Her symptoms included a loss of appetite, constipation, excessive crying, abnormal sleep patterns, and a fever.  Following Chicago HMO's instructions--"HMO told me I had to call the office before I had to go"--Jones telephoned Dr. Jordan's office, but Dr. Jordan was not available.  A nurse advised her to give Shawndale some castor oil, and Jones left a message for Dr. Jordan.  Dr. Jordan returned Jones' message and echoed the nurse's castor oil suggestion.  

On January 19, 1991, Jones took Shawndale to the emergency room when her condition did not improve.  Shawndale was admitted and later was diagnosed with bacterial meningitis.  As a result of this meningitis, Shawndale became permanently brain damaged.

On October 28, 1992, Jones filed a medical malpractice complaint against, among others,
 Chicago HMO.  After several pleading attempts, Jones filed her second amended complaint.

Discovery revealed a single criticism of Dr. Jordan.  The plaintiffs' expert, Dr. Richard Pawl, said Dr. Jordan deviated from the standard of care when he did not schedule an immediate appointment for Shawndale on being advised of a history of a three-month old infant who was warm, irritable, and constipated.

Chicago HMO filed a summary judgment motion, and on October 7, 1997, the trial court granted summary judgment to Chicago HMO on all three counts.  The trial court also granted Chicago HMO's request for a Rule 304(a) finding.  See 157 Ill. 2d R. 304(a).  This appeal followed.

DECISION

1. Standard of Review

Because we consider a grant of summary judgment we conduct  a 
de
 
novo
 review of the facts and law to determine whether any  material issue of fact exists as to any of the counts of the plaintiff's complaint.  
Outboard Marine Corp. v. Liberty Mutual
 
Insurance Co.
, 154 Ill. 2d 90, 102, 607 N.E.2d 1204 (1992).

2. Nature of the HMO

While there are several HMO models, both sides agree Chicago HMO is an independent practice association (IPA) model HMO.  An IPA HMO is one of two models provided for in the Illinois Health Maintenance Act.  See 215 ILCS 125/1-2(7) (West 1994).  Briefly put, an IPA HMO contracts with independent medical groups or individuals, "rather than directly employing them."  
Petrovich
, 296 Ill. App 3d at 852.

IPA model HMOs bring together providers (physicians) and subscribers (patients): "An HMO is a facilitator.  It arranges for medical services."  
Patel v. Healthplus, Inc.
, 112 Md. App. 251, 684 A.2d 904, 908 (1996).   

Because the HMO is a facilitator, as Chicago HMO is in this case, two distinct contracts are required--here, the Chicago HMO-IDPA contract, in which Chicago HMO agreed to provide specified health care services to Medicaid Beneficiaries in return for a fixed payment, and the Chicago HMO-Dr. Jordan contract, where Chicago HMO agreed to pay Dr. Jordan a monthly named dollar amount for specified demographic groups, regardless of the amount of services rendered or number of patients actually treated.  See 
Patel
, 684 A.2d at 908.

An HMO contract is not a contract for the direct furnishing of medical services, but is, instead, "merely a contract for the administration of an employee health care program ***."  
Compass
 
Health Care Plans v. Board of Education of Chicago
, 246 Ill. App. 3d 746, 750, 617 N.E.2d 6 (1992).

By assigning large numbers of subscribers to providers--through "bulk buying power"--HMOs can procure health care services below market prices.  
Patel
, 684 A.2d at 908.  In this case Jones was not an employee.  She was a Medicaid recipient who signed on with Chicago HMO.  But the description holds.

Ordinarily, as is true here, IPA model HMO contract physicians use their own offices and equipment, keep their own records, and often maintain their own independent practices.  See Comment, 
A "New" Approach to Medical Malpractice:  The Liability of HMOs for Member Physician Negligence
, 1994 Detroit College L. Rev. 1263, 1265.

We now examine the three counts of Jones' Second Amended Complaint.

3. Count I--"Institutional Negligence"

This count alleges independent corporate negligence by Chicago HMO.  While several charges are made in the count, not all have factual support.  None creates a material issue of fact.

There is some evidence Chicago HMO required subscribers to obtain telephone consultations with their designated doctor before scheduling an office visit.  To that same end, Chicago HMO instructed its physicians to encourage subscribers to call in advance for appointments.  This case, however, centers on what happened when Jones made the telephone call.  It was the alleged conduct of Dr. Jordan, not any Chicago HMO policy or instruction, that delayed treatment of Shawndale's condition.

In addition, there is some evidence concerning the number of patients Dr. Jordan was treating.

Chicago HMO's Trubitt said Federal regulations limited the number of subscribers per physician.  According to Trubitt, each pediatrician should have no more than 3,500 patients.  The Chicago HMO-IDPA agreement limited Dr. Jordan, as a board eligible physician, to 1,200 patients.  But Chicago HMO assigned Dr. Jordan 4,527 patients in 1990.  In addition, Dr. Jordan had 1,500 other patients through other HMOs.

There is no evidence in this record specifically linking the amount of patients Dr. Jordan had in January of 1991 to the alleged negligence in this case--the failure to schedule an immediate appointment to see Shawndale.

No Illinois case has held an HMO can be liable for an injury to the plan's patient on a theory of independent corporate negligence.  
Petrovich
 and 
Raglin
 make passing reference to the viability of such a theory, but they did not decide the question.

The dicta in those cases indicates there may be two kinds of HMO corporate negligence: one is the negligent selection or negligent control of the physician; the other consists of independent acts of negligence, for example, in the management of utilization control systems.  
Raglin
, 230 Ill. App. 3d at 646; 
Petrovich
, 296 Ill. App. 3d at 855.  No further explanation is offered.

We note the Superior Court of Pennsylvania has held there is such a cause of action against an HMO.  See 
McClellan v. Health
 
Maintenance Organization of Pennsylvania
, 413 Pa. Super. 128, 604 A.2d 1053 (1992).  And a Missouri Court of Appeals held an HMO has a duty to conduct a reasonable investigation of its listed doctor's competency.  Had it done so, said the court, it would have discovered his extensive history of defending malpractice suits.  See 
Harrell v. Total Health Care, Inc.
, No. WD 39809 (Mo. App. 1988), 
aff'd
, 781 S.W.2d 58 (Mo. 1989).

To survive in this State, the HMO independent corporate negligence theory would have to be analogized to the existence of a direct negligence claim against a hospital.

A hospital owes its patients an independent duty, administrative and managerial in nature, to review and supervise medical treatment.  
Malanowski v. Loyola University of Chicago
, 293 Ill. App.3d 720, 729, 688 N.E.2d 732 (1997); 
Rohe v. Shivde
, 203 Ill. App 3d 181, 198, 560 N.E.2d 1113 (1990).  But corporate responsibility to patients has never been extended in this State to a duty to supervise an independent physician contractor in his private office outside the hospital facility.  See 
Malinowski
, 293 Ill. App. 3d at 730.  Dr. Jordan maintained his office at a location having nothing to do with Chicago HMO.

Jones has alleged, but offered no evidence of, Chicago HMO's failure to investigate Dr. Jordan's credentials and experience with malpractice allegations.  There is no need, then, to determine whether factually supported allegations of negligence in the selection and retention of a contract physician would be sufficient to state a cause of action. 

We have reviewed the record for evidence that Chicago HMO

was guilty of a negligent act that proximately caused the injury in this case.  We find none.  Speculation cannot take the place

of fact.  We have found no reported case anywhere that creates HMO liability on facts similar to those developed in this case.

We have been especially cautious when treading through this new ground.  While we believe there may be circumstances that establish the independent corporate negligence of an HMO, we also understand this territory is fraught with considerations of public interest, matters that courts are ill-equipped to determine.  We note that two bills on managed care reform were considered, but not acted upon, by our legislature in 1998.  See 90th Ill. Gen. Assem., Senate Bill 1904 (Managed Care Reform Act), 1998 Sess.; 90th Ill. Gen. Assem., House Bill 974, 1998 Sess.  We presume the matter will again be addressed.

We hold the trial judge correctly granted summary judgment on count I.

4. Count II--"Vicarious Liability"

The evidence clearly establishes Dr. Jordan was an independent contractor.  While Chicago HMO did conduct some review of the quality of care given, Dr. Jordan used his own medical judgment to decide whether and how to treat a subscriber. He was not an employee of Chicago HMO. 

Plaintiff recognizes she cannot establish an actual agency.

Instead, she contends she has created a fact issue on the question of apparent or ostensible agency.

There is Illinois authority on this issue.  In 
Raglin
 the  court assumed, without deciding, an HMO can be held liable for  its contract physician's negligence on an apparent authority theory.  It proceeded to apply apparent authority principles as they existed in 1992, finding the agency relationship between the HMO and the doctors was not established as a fact issue.

In 1996, 
Petrovich
 held the doctrine of apparent authority can be applied to an HMO.  We agree with that holding.

Again, the analogy is to hospital negligence cases.  The path was cleared by our supreme court in 
Gilbert v. Sycamore Municipal Hospital
, 156 Ill. 2d 511, 622 N.E.2d 788 (1993).  
Petrovich
 relied on 
Gilbert
's analysis of the apparent or ostensible authority a hospital might give to an independent contractor physician.  So do we.   

Questions of fact arise in an apparent agency case:  Was the agent authorized to act for the principal?  Did the injured patient have notice of the lack of the agent's authority?

The word "apparent" is the key to the inquiry.  "Apparent  authority in an agent is the authority which the principal knowingly permits the agent to assume, or the authority which

the principal holds out the agent as possessing."  
Gilbert
, 156  Ill. 2d at 523.

     Apparent authority elements have little to do with actual control of the physician's conduct.  Rather, "It is the authority which a reasonably prudent person [the patient], exercising diligence and discretion, in view of the principal's [the HMOs] conduct, would naturally suppose the agent to possess."  
Gilbert
, 156 Ill. 2d at 523.

The inquiry focuses, then, on the principal's words and conduct made known to the patient.  Appearances count.  It does not matter that the doctor was in fact an independent contractor. 
Dahan v. UHS of Bethesda, Inc.
, 295 Ill. App. 3d 770, 776-77, 692 N.E.2d 1303 (1998).  It could matter very much when the patient is informed on a consent form that the treating doctor is an independent contractor.  See 
James v. Ingalls Memorial Hospital
, No. 1-97-2422 (September 30, 1998).

Apparent authority does not require that the hospital expressly tell the patient the physician is its employee.  It is enough that the "hospital holds itself out as a provider of *** care without informing the patient that the care is provided by independent contractors."  
Gilbert
, 156 Ill. 2d at 525.

Applying the applicable elements of the apparent authority doctrine to the facts of this case, we look for the answers to two questions:  Did the HMO act in a manner that would lead

Jones, as a reasonable person, to conclude Dr. Jordan was an employee or agent of the HMO?  And, did Jones act in reliance

on the conduct of the HMO, consistent with ordinary care and prudence?  See 
Gilbert
, 156 Ill. 2d at 525.  It is important to note the plaintiff's reliance had to be "justifiable," 
Gilbert
, 156 Ill. 2d at 524; 
Grutzius v. Franciscan Sisters Health Care
,

251 Ill. App. 3d 897, 900, 623 N.E.2d 853 (1993), not the "detrimental" reliance burden relied on in part by 
Raglin
 when it determined there was no showing of apparent agency by the plaintiff.  See 
Raglin
, 230 Ill. App. 3d at 648.

Gilbert
 looked to the "realities of modern hospital care"  to measure the reasonable expectations of members of the public.  
Gilbert
, 156 Ill. 2d at 511.  
Petrovich
 applied that same public policy argument to HMOs, "*** whose aggressive advertising campaigns arguably create the expectations in the public that they are providers of health care."  
Petrovich
, 296 Ill. App. 3d at 861.

We are, of course, constrained by the record in this case.

While there is no evidence of an aggressive advertising campaign by Chicago HMO, there is evidence Chicago HMO engaged in an aggressive, door-to-door marketing campaign to enroll Medicaid recipients into its managed health care program.

Representatives came to Jones' homes twice--in Park Forest and when she moved to Chicago Heights.  She said the representative who visited her in Park Forest during a door to door campaign told her managed care was superior to Medicaid: "I asked him what kind of benefits you get out of it and stuff, and he was telling me that it is better than a regular [Medicaid] card."

Jones signed an enrollment understanding in which Chicago HMO agreed to provide all her medical care.  And she testified she saw some Chicago HMO literature in Dr. Jordan's office, although she could not say what it was.

Jones was given no choice of pediatrician.  It was to be Dr. Jordan.  She testified Chicago HMO "gave" her to Dr. Jordan with assurances he was a good pediatrician.  She never was told, directly or indirectly, or in any literature, that Chicago HMO would not be responsible for Dr. Jordan's negligence.

True, she said she never read the Chicago HMO handbook.

But that fact is of no solace to Chicago HMO.  If she had, she would have seen Dr. Jordan described as a "Chicago HMO personal doctor," and a "Chicago HMO primary care physician."  She also would have read: "Chicago HMO provides complete medical care ***."  She would not have seen any indication Dr. Jordan was an independent contractor.  However, since the focus of our inquiry must be on Chicago HMO's words and conduct communicated to Jones, we do not rely on what was or was not in the handbook.

We conclude Chicago HMO's aggressive marketing techniques  and its statements to Jones, through its representatives, create an issue of material fact concerning apparent authority of Dr. Jordan to act for Chicago HMO.  It is for the jury to decide whether Chicago HMO is vicariously liable for the negligence, if proven, of Dr. Jordan.  The grant of summary judgment on count II of the complaint is reversed and remanded for further proceedings.

4. Count III-"Contract Liability"

The plaintiff seeks to establish a contractual relationship between Chicago HMO and her that would support a claim for damages caused by Dr. Jordan's negligence.  She expressly disavows any intent to rely on a third-party beneficiary theory. Instead, she seems to say she is an actual party to the agreement between Chicago HMO and IDPA.  The short answer to that contention is that she is not a party to the contract.  This is a contract for the administration of a health care program, not a contract for the direct furnishing of medical services.  See 
Compass Health Care
, 246 Ill. App. 3d at 750.

Despite the 
Raglin
 and 
Petrovich
 dicta that "Contract law might also be utilized to hold HMOs liable for malpractice based on breach of contract or breach of warranty," we find no case in Illinois so holding.  
Raglin
, 230 Ill. App. 3d at 646; accord 
Petrovich
, 296 Ill. App. 3d at 855.  We decline to be the first, especially where the plaintiff's theory is murky at best.

We conclude the trial court did not err when it granted  summary judgment on count III.

                         
CONCLUSION

For reasons we have set out above, we affirm the trial court's grant of summary judgment on counts I and III of the plaintiff's complaint, and we reverse summary judgment on count II, remanding that claim to the trial court for further proceedings.

AFFIRMED IN PART, REVERSED AND REMANDED IN PART. 

SOUTH, P.J., and McNAMARA, J., concur.